

# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

### NO. AP-76,289

### PAUL DEVOE, Appellant

### v.

### THE STATE OF TEXAS

### ON DIRECT APPEAL
### FROM CAUSE NO. 07-302093 IN THE 403RD DISTRICT COURT
### TRAVIS COUNTY

HERVEY, J., delivered the opinion of the Court in which KELLER, P.J., and MEYERS, JOHNSON, KEASLER, COCHRAN and ALCALA, JJ., joined. PRICE and WOMACK, JJ., concurred.

## O P I N I O N

Appellant, Paul Devoe, was convicted in October 2009 of capital murder, specifically the intentional murder of two individuals (Haylie Faulkner and Danielle Hensley) during the same criminal transaction. *See* TEX. PENAL CODE § 19.03(a)(7)(A). Based upon the jury's answers to the special issues set forth in Texas Code of Criminal Procedure Article 37.071, Sections 2(b) and 2(e), the trial judge sentenced Appellant to

death. TEX. CODE CRIM. PROC. art. 37.071, § 2(g).[1]  Direct appeal to this Court is automatic.  Art. 37.071, § 2(h).  Appellant raises nine points of error.  After reviewing Appellant's points of error, we find them to be without merit.  Consequently, we affirm the trial court's judgment and sentence of death.

Appellant challenges the sufficiency of the evidence at the punishment phase of trial.  We shall address this issue first.  The remaining points of error will be addressed in the order presented in the briefs.

In point of error eight, Appellant contends that the evidence is insufficient to prove beyond a reasonable doubt that there is a probability that he will commit criminal acts of violence that would constitute a continuing threat to society.  *See* art. 37.071, § 2(b)(1).  Specifically, he argues that his behavioral record in prison is "almost pristine," and therefore, the State's evidence of problems within the Texas Department of Criminal Justice (TDCJ) should not be weighed against him.

In reviewing the sufficiency of the evidence at the punishment phase, we view the evidence in the light most favorable to the verdict and determine whether any rational trier of fact could make the finding beyond a reasonable doubt.  *Banda v. State*, 890 S.W.2d 42, 50 (Tex. Crim. App. 1994); *see also Young v. State*, 283 S.W.3d 854, 863 (Tex. Crim. App. 2009).  Some factors a jury may consider when determining whether a defendant will pose a continuing threat to society include the following:

---

[1] Unless otherwise indicated, all future references to Articles refer to the Texas Code of Criminal Procedure.

> 1. the circumstances of the capital offense, including the defendant's state of mind and whether he or she was working alone or with other parties;
> 2. the calculated nature of the defendant's acts;
> 3. the forethought and deliberateness exhibited by the crime's execution;
> 4. the existence of a prior criminal record, and the severity of the prior crimes;
> 5. the defendant's age and personal circumstances at the time of the commission of the offense;
> 6. whether the defendant was acting under duress or the domination of another at the time of the commission of the offense;
> 7. psychiatric evidence; and
> 8. character evidence.

*Keeton v. State*, 724 S.W.2d 58, 61 (Tex. Crim. App. 1987); *see also Coble v. State*, 330 S.W.3d 253, 287-89 (Tex. Crim. App. 2010). This list is not exclusive.

In determining the special issues, the jury is entitled to consider all of the evidence at both the guilt and punishment stages of trial. Art. 37.071, § 2(d)(1); *see also Young*, 283 S.W.3d at 863. The circumstances of the offense and the events surrounding it may be sufficient in some instances to sustain a "yes" answer to the future dangerousness special issue. *Banda,* 890 S.W.2d at 51; *see also Hayes v. State,* 85 S.W.3d 809, 814 (Tex. Crim. App. 2002).

The evidence presented at guilt revealed that, in late August 2007, Appellant stole a silver Jennings .380-caliber handgun ("the gun"), two ammunition magazines, and fifteen Winchester bullets from his friend, Bill Brinlee. Brinlee considered Appellant to be "family," as Appellant had previously lived with the Brinlees. Appellant had access to the house, knew that the Brinlees would be out of town for a wedding during the weekend of August 24, and was aware that the gun was kept in the master bedroom.

On August 24, 2007, Appellant was residing at the Llano home of Sharon Wilson in exchange for work he had agreed to do around her home.  At about 3:00 p.m., Wilson came home to find Appellant outside with the gun.  Wilson had previously informed Appellant that she did not allow firearms in her home, and she asked that he not bring it in the house.  She assumed that Appellant complied with her request.

A short while later, Wilson found Appellant looking in her purse.  He claimed to be looking for a cigarette.  Appellant then went to take a nap.  At this point, Wilson decided that it was time to ask Appellant to vacate her home.  She called some friends to be with her when she told him because she was afraid of how Appellant might react to the request.  While waiting for her friends, she discovered that Appellant had emptied the gas can that she had filled for her lawn mower.  Angered, Wilson felt she could wait no longer, so she went to confront Appellant.

Upon finding Appellant asleep in her bedroom, Wilson woke him and told him that he needed to leave.  Appellant got up and went directly to the living room couch where he retrieved the gun from a hiding place behind the cushions, and he pointed it at Wilson's head and mid-section.  Wilson knocked Appellant's arm so that the gun pointed away from her.  Appellant then fired the gun multiple times into the couch and walls.  Appellant spoke of killing himself.  He told Wilson that he had only two bullets left and that he was going to his trailer, which was parked nearby, to get more.  Appellant advised Wilson not to go near her pickup truck, but he told her she could go outside to smoke a

cigarette.  When Appellant walked out the door, Wilson grabbed her dog and ran from her home.  She hid in heavy vegetation and cactus in the adjoining field.  She heard Appellant start a truck, and he drove it towards Wilson.  He stopped and revved the engine several times before backing up.  Wilson saw Appellant drive away in her blue Dodge Dakota pickup truck.  The license plate number was 21X-ZJ5.  Wilson later found that her money and credit cards were missing from her purse.  Investigators recovered .380-caliber bullets and shell casings from her home, and Wilson turned over Appellant's day planner, which contained a photocopy of Paula Griffith's driver's license.

Later that evening, Glenda Purcell was at her usual hangout, O'Neill's Sports Tavern in Marble Falls.  Purcell had recently broken up with Appellant after a tumultuous six-month romantic relationship that ended when she asked him to move out of her home.  Following the break-up, Purcell obtained a protective order against Appellant, of which Appellant had notice.  Michael Allred was on duty as a bartender that night.

At approximately 8:30 p.m., Appellant entered O'Neill's Sports Tavern.  He was dressed in what Purcell described as his "motorcycle attire": a black leather vest, chaps, a cap, and a jacket.  Purcell immediately called out for someone to call the police because she had a protective order against Appellant.  Appellant then walked over to Purcell, put his hand over her eyes, and held the gun to her head.  He pulled the trigger several times, but the gun jammed.  Purcell then ran back towards the men's room where Allred was repairing something.  She yelled, "Mike, Mike, [Appellant's] here, he's got a gun."

Allred stepped between Purcell and Appellant. Allred tried to persuade Appellant to calm down and to give him the gun, but Appellant then shot Allred in the chest with a .380-caliber bullet, severing his aorta and killing him. Purcell ran out of the back door to the police station next door. Witnesses saw Appellant flee the bar in a blue Dodge Dakota pickup truck with the license plate 21X-ZJ5. Appellant was headed in the direction of Jonestown.

Paula Griffith lived in a house in Jonestown with her fifteen-year-old daughter, Haylie Faulkner. Griffith previously dated Appellant, but they had not had a romantic relationship in some time. By all accounts, the break-up seemed amicable, and Appellant kept in touch with Faulkner, even paying her entry fee into some beauty pageants.

On the evening of August 24, Griffith, Faulkner, Faulkner's friend (Danielle Hensley), and Griffith's boyfriend (Jay Feltner) were at Griffith's home preparing for a trip to Fiesta Texas, an amusement park in San Antonio. Griffith had obtained tickets to celebrate the last weekend before the start of school. The group planned to travel to San Antonio on Friday night, spend the day at Fiesta Texas on Saturday, and return to Jonestown late Saturday night. Hensley was to return to her family's home in Leander on Sunday.

On that Friday evening, August 24, Hensley's mother and step-father began to worry when they did not receive a phone call from her because Hensley normally called to say good night. On Saturday, her parents were still unable to reach Hensley, Griffith,

or Faulkner.  They called the Jonestown police, but the police were unable to assist because the parents did not know the physical address of Griffith's house.  When searching the internet for news of any auto accidents or other events that might explain Hensley's failure to make contact, Hensley's step-father learned about the murder in Marble Falls and that the police were looking for a blue Dodge Dakota pickup truck with the license plate number 21X-ZJ5.

On Sunday morning, August 26, Hensley's parents drove to Griffith's home in Jonestown.  As they approached the driveway, Hensley's step-father saw a blue Dodge Dakota pickup truck parked near the house.  He recognized the license plate number from his internet search the day before, and he knew that something was wrong.  He parked a block away and called the police.

After securing the area, the police entered Griffith's home to check on the welfare of the people possibly inside and discovered the four bodies.  Feltner had been shot in the head from close range while sitting at the kitchen table.  Griffith had been shot in the back of her head, apparently while she was running from the living room.  Faulkner had fallen to the living room floor with a gunshot wound to the head.  Hensley, who was lying on the living room couch, had four gunshot wounds including a fatal wound to the head. The group had apparently been preparing dinner as raw meat sat out on the counter and the barbecue grill outside was open.

It appeared to the investigators that each of the females' purses had been searched

and the contents dumped onto a couch. Feltner's duffle bag had also been searched, and his cell phone was discovered to be missing. A carton of Skydancer cigarettes was on the same couch, and a cigarette butt was found on the floor. No identifiable fingerprints were found at the scene.

Police confirmed that the blue Dodge Dakota pickup truck parked at Griffith's home was the same one that had been used to flee the murder in Marble Falls. Investigators collected three Natural Light beer cans, one empty Sport cigarette package, cigarette butts from the ashtray, and a set of General Motor keys from the pickup. They also discovered that Griffith's white 2001 Saturn station wagon was missing.

Meanwhile, beginning Friday night, August 24, Appellant began calling his friend, Brinlee. During his first phone call, Appellant told Brinlee that he had "shot at" six people and "maybe killed two" people. He stated that he "was on the run." During the second call, Brinlee noticed that Appellant was not calling from his cell phone; he was now calling from a new number. It was later determined that Appellant was using Feltner's cell phone. This second call was placed at 11:44 p.m. in the vicinity of a cell tower in Belton, Texas.

During his second or third phone call to Brinlee, Appellant said that "he was going after [Purcell] and her father and mother." He told Brinlee that he had gone to the bar to kill Purcell, but the bartender got in the way. Appellant said that he took a couple of shots at Purcell, but the gun jammed and that was why Purcell was not dead.

Records for Wilson's credit card showed that someone attempted to use it at a Round Rock gas station on August 24.  Call records for Feltner's phone showed points along the route that Appellant took as he fled Texas.  In addition to the call from the Belton area, Appellant used the phone while he was near the following locations: Mount Sylvan, Texas (Saturday, August 25 at 3:17 a.m.); Okalona, Arkansas (Saturday, August 25 at 9:12 a.m.); Bakerville, Tennessee (Saturday, August 25 at 3:30 p.m.); Shippensburg, Pennsylvania (Sunday, August 26 at 2:40 p.m.); and Siperstein Plaza, New Jersey (Sunday, August 26 at 6:46 p.m.).  Appellant was traveling to his mother's home in Shirley, New York.

On Sunday, August 26, while Appellant was driving through Pennsylvania, Griffith's Saturn station wagon began stalling and "riding rough."  Appellant decided that he needed a different car, so he left Interstate 81 in the town of Greencastle.  Appellant spotted a "nice car" in a driveway.  Armed with the gun, he entered the home of Betty DeHart and found the keys to her blue 2006 Hyundai Elantra.  He transferred his items from Griffith's car into the Hyundai, including a Walmart bag containing ammunition, Skydancer cigarettes, sunglasses, and a road map.  Appellant then continued driving to New York.  An expended .380-caliber bullet and shell casing were recovered from DeHart's home.  In Griffith's Saturn station wagon, investigators found an identification badge for Griffith, a certificate of Faulkner's participation in a beauty pageant, a paper towel holder, a peanut can, and Powerade, Dr. Pepper, and Coca-Cola bottles.

Around noon on Monday, August 27, Appellant was located at the home of his friend and former employer, Gerald Baldoni, in the Long Island town of Shirley, New York. Baldoni invited the initial officer into his home and told him that Paul was there. The officer called for back-up, and when the officers subsequently entered the home, Appellant came out into the hallway from a bedroom with the gun pointed to his head. Appellant asked the officers to call his mother. He also stated that he did not want to go to jail for what he did because he knew that he was going to spend a long time there. After a short stand-off, Appellant threw down his weapon and surrendered.

Investigators recovered the gun, which had a bullet in the chamber and a loaded magazine. They also recovered Appellant's black cowboy boots, leather vest, cap, and other clothing, and inside the vest's pocket, they discovered Wilson's credit card, a loaded magazine, loose shells, a Bic lighter, a pocket knife, a business card, and a piece of paper with a cell phone number written on it. DeHart's Hyundai was found parked at Baldoni's home; the keys were found in the house. Inside the Hyundai, they recovered Feltner's cell phone and the Walmart bag, which contained a box of 100 Winchester .380-caliber bullets, an open carton of Skydancer cigarettes, a pair of sunglasses, a road atlas with the area around DeHart's home circled in ink.

Pending his extradition to Texas, Appellant was held in custody by the Suffolk County, New York Police Department. Appellant made the following unsolicited statements in the presence of an officer: "They're going to extradite me back to Texas,

then probably Tennessee, West Virginia, Pennsylvania, then probably back here. I bet they found me when I turned my damn cell phone on. I had that bitch turned off the whole time and they didn't have a clue where I was"; "I had a good fucking thing going on in Texas, too. Business, house, vehicles. If it wasn't for my stupid fucking girlfriend. One mistake ruined my whole fucking life"; "Do you know how many bodies they found? Five, six in Texas. Maybe 12 bodies." Appellant also spoke with a detective of the Suffolk County Police Department. He described many of the events surrounding the instant offenses, but he did not speak specifically about the acts of shooting or killing.

After his return to Texas, Appellant told a cellmate in the Travis County Jail, "I'll be here for a long time . . . I killed six people." Also while in jail, during a recorded conversation with an acquaintance, Tiffany Waldrop, Appellant told Waldrop that he thought that he would be in jail for "[l]ife. I'm getting the death penalty." When Waldrop asked Appellant if he had spoken with Brinlee, Appellant responded, "I've talked to [Brinlee], oh, they don't want him basically him [sic] talking to me right now . . . . Because it was [Brinlee]'s gun that I used." Appellant also told Waldrop, "I just wish I had never had that gun."

DNA analysis identified Feltner's and Allred's blood on Appellant's boots. Appellant's DNA was on a cigarette butt found at the Jonestown crime scene and on Dr. Pepper and Coca-Cola bottles left in Griffith's Saturn station wagon. A DNA profile consistent with a mixture of Appellant's and Faulkner's DNA was found on a Gatorade

bottle also left in the station wagon. Ballistics analysis determined that the bullets recovered from the Llano, Marble Falls, Jonestown, and Pennsylvania crime scenes were all fired from Brinlee's .380-caliber pistol.

The evidence presented at punishment revealed that Appellant shot and killed 81-year-old Betty DeHart when he stole her blue Hyundai in Greencastle, Pennsylvania. DeHart was found lying on her bed with a close-range gunshot wound to the head. Appellant claimed to have chased her into her home and that he shot her because "she wouldn't stop screaming."

Appellant possessed a lengthy criminal history. He was incarcerated in Burnet County, Texas, for various misdemeanors. Before that, he was jailed in Suffolk County, New York, over twenty times between 1980 and 2004, including an incarceration in the Gowanda state prison from 1997 to 2002. Appellant's convictions in Suffolk County, New York, included aggravated unlicensed operation of a motor vehicle, aggravated harassment, criminal trespass, disorderly conduct, endangering the welfare of a child, two convictions for harassment, three for assault, and four for felony driving while intoxicated. Appellant's 1989 assault conviction was for shooting another young man with a 12-gauge shotgun following an altercation that Appellant incited; that man testified about that incident and his resulting wounds.

Appellant also had a lengthy history of abusing women. Appellant told a former neighbor that he "liked to slap the girls around." Purcell, the woman Appellant attempted

to kill in Marble Falls, testified about earlier abuse by Appellant. On one occasion, he punched her in the face and broke her nose. On another occasion occurring June 15, 2007, while driving, she and Appellant were run off the road. Appellant chased down the offending truck, forced it to stop, and pulled the driver—a young woman—out of the truck. He threatened to beat up the young woman, but Purcell persuaded him not to do so. Later that same night, Purcell complained that Appellant had been living in her home for four months without paying any bills or helping out. Appellant became angry, and he cut Purcell's clothes off with a knife, punched her several times, and held a knife to her throat. He also hit Purcell with the finial from a bed post, breaking two of her ribs, and he threatened to shoot her. Purcell subsequently kicked Appellant out of her home and obtained a protective order.

Jody Pagel, a woman whom Appellant had dated in the early 1980s while living in New York, testified regarding three incidents involving Appellant. During the first incident, Appellant drank too much and attempted to choke her to death. Pagel testified that the second incident occurred in the house, but she could not recall the facts clearly. During the third incident, they were at a bar when Appellant choked Pagel so hard that he lifted her up off the floor; he then threw her to the ground. Following the assault, Appellant sat at the bar with another woman as if nothing had happened. After Pagel broke up with Appellant, Appellant made harassing phone calls in which he threatened to kill Pagel and her new boyfriend. Pagel reported the calls, and she obtained a protective

order.

On December 20, 2006, Appellant went to the emergency room at South Austin Medical Center. When a female physician told him that it would not be a good idea for him to leave the hospital, Appellant spoke aggressively and abusively to someone on the phone and then threatened to physically harm the female doctor.

Mary McNellage testified that Appellant lived in her Spicewood, Texas, home for 89 days. She wanted him to leave due to his lies, drinking, and uncontrolled behavior. McNellage did not want to ask Appellant directly to leave because Appellant had previously physically threatened her. Consequently, she left him a car and a suitcase along with a note that asked him to leave her things alone and "just go." She had also washed and folded his clothes and had packed them and his other belongings in the suitcase and car. McNellage then stayed at a friend's house for 13 days because she was afraid of Appellant's reaction to the note. Appellant refused to leave, but eventually he was forced to go. After McNellage finally returned home, Appellant showed up around 3:00 a.m. saying that he wanted to have sex with her. When she rebuffed his advances, Appellant held a hunting knife to her throat. She managed to fight Appellant off and call 9-1-1. Charges were filed against Appellant, and the case was pending at the time of the capital murders.

Appellant's family confirmed that, when Appellant was in his twenties, he once attempted to strangle his mother with a telephone cord. Following that incident,

Appellant's mother obtained a protective order against him.

The jury also received ample evidence from numerous witnesses that Appellant abused alcohol and drugs and that he tended to become more violent when he did so. Appellant's mother testified, via deposition, that Appellant became "very violent" when he was drinking—he "would take things apart, tear up the house, and break down doors. He would act like that no matter whose house he was at."

Appellant's substance abuse was also the subject of expert testimony. Defense psychiatrist Dr. Robert Cantu interviewed Appellant. His understanding from Appellant was that Appellant had smoked a half to one ounce of methamphetamine in the 12 hours preceding the instant offense, in addition to drinking what Appellant reported as a liter of rum that day. Cantu testified that Appellant would be a danger to others in prison if he had access to large quantities of drugs or alcohol, if he had the opportunity to harm weaker people there, and if he were in an unstructured environment that allowed him to go places without direct supervision. Cantu stated, "I think if those three things . . . were present, that he would be a future danger, yes, sir." Cantu also believed that Appellant did "know what he was doing" during the time of the instant offense.

A.P. Merillat, a senior criminal investigator for the Texas Special Prosecution Unit, testified that inmates in Texas prisons have access to drugs, alcohol, and weapons. He further testified that many violent crimes occur inside Texas prisons.

Dr. Richard Coons, a psychiatrist, testified for the State without objection. After

interviewing Appellant and reviewing his records, Coons agreed with Cantu's assessment that Appellant would be a continuing threat to society. In Coons's opinion, Appellant was "drug dependent and . . . I think if he were given the opportunity, [Appellant] would certainly try to get them, try to use them" in prison. During Coons's interview with him, Appellant described the instant offenses in detail. Appellant told him that he was angry when he shot the gun in Wilson's home, but he said that the shooting of Allred "was an accidental shooting." He claimed that he went to Griffith's home to get money and that he shot Feltner because Feltner came at him (despite the physical evidence that Feltner was seated at the kitchen table). He shot Griffith and the kids because they were screaming. He also stated that he shot DeHart because she was screaming.

Coons concluded that Appellant was not operating under any type of psychosis during the instant offense. He found that Appellant planned his behavior and was "actively responsive to what he [felt] he need[ed] to do." Coons agreed with Appellant's previous diagnoses of psychotic disorder not-otherwise-specified, antisocial behavior, and personality problems, and that Appellant is polysubstance dependent.

In reaching a determination that Appellant would be a future danger, Coons evaluated the following factors: (1) Appellant's long history of violence; (2) the awful set of facts related to the instant offense; (3) Appellant's attitude toward violence, which is impulsive with a lack of empathy; (4) Appellant's antisocial personality behaviors; (5) Appellant's lack of any remorse; and (6) the prison society that Appellant would be in.

The defense's expert, psychologist Dr. Ollie Seay, evaluated Appellant for mental retardation and concluded that Appellant did not fit the criteria for that diagnosis. Seay did testify, however, that he believed that Appellant may have "possible mental limitations." Neuropsychologist Dr. Leslie Rosenstein surmised that Appellant has deficits and weaknesses in his neurocognitive functioning, but she agreed that Appellant was not legally mentally retarded.

Appellant's aunt, Laura Nelson, and sister, Elizabeth Petrie, testified on his behalf. Nelson stated that she did not think Appellant was treated well by his step-father and that he seemed to be punished a lot. Her memories of Appellant are of a caring, loving, and sharing person. However, Nelson admitted that she had not seen Appellant in several years. She knew that he had relationships with numerous women, that he would live off of them, and that the relationships ended because of fighting.

Petrie testified that Appellant was a typical brother, but he did "smack" her and physically push her while they were growing up. She noted that Appellant did not do well in school and that he started drinking when he was fifteen. She was aware that her brother could be "very violent" and that his relationships with women frequently involved violence. Appellant called Petrie while he was "on the run" in the instant offense, and he told her that he had shot people and did not know if they were alive or dead. Petrie told Appellant to turn himself in and not to hurt anyone else; he responded, "I gotta do what I gotta do." Appellant also presented evidence that he did not have a record of disciplinary

problems during his many incarcerations.

On appeal, Appellant's argument centers on the weight that should be given to his "pristine" behavioral record while incarcerated. However, while good behavior in prison is a factor to consider, it does not preclude a finding of future dangerousness. *See Emery v. State*, 881 S.W.2d 702, 707 (Tex. Crim. App. 1994). We have held that this Court can review the objective evidence of future dangerousness, but we do not engage in reviewing the jury's normative decision on mitigation. *Young*, 283 S.W.3d at 865; *Colella v. State*, 915 S.W.2d 834, 845 (Tex. Crim. App. 1995). Therefore, we conclude that there was sufficient evidence to support the jury's affirmative finding on the future dangerousness issue, and we defer to the jury's conclusion that the mitigating evidence was not sufficient to warrant a sentence of life imprisonment. Point of error eight is overruled.

In point of error one, Appellant claims that the trial court erred in allowing him "to be tried on copious amounts of extraneous offense evidence" at guilt in violation of Texas Rule of Evidence 404(b), thereby denying him a fair trial. Specifically, he complains that the trial court improperly permitted the State to present extraneous offense evidence pertaining to the theft of Brinlee's gun, the aggravated assault of Wilson in Llano, the killing of Allred in Marble Falls, and the robbery of DeHart in Pennsylvania.[2] Appellant concedes that the murders of Griffith and Feltner constitute same-transaction contextual evidence.

---

[2] As noted previously, evidence of DeHart's murder was not presented during the guilt phase of trial.

Evidence of extraneous offenses is not admissible at the guilt phase of a trial to prove that a defendant committed the charged offense in conformity with a bad character. Tex. R. Evid. 404(b); *see Nobles v. State*, 843 S.W.2d 503, 514 (Tex. Crim. App. 1992). However, extraneous offense evidence may be admissible when it has relevance apart from character conformity. *Moses v. State*, 105 S.W.3d 622, 626 (Tex. Crim. App. 2003). For example, it may be admissible to show proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. *Id.* Evidence of another crime, wrong, or act also may be admissible as same-transaction contextual evidence where "several crimes are intermixed, or blended with one another, or connected so that they form an indivisible criminal transaction, and full proof by testimony, . . . , of any one of them cannot be given without showing the others." *Wyatt v. State*, 23 S.W.3d 18, 25 (Tex. Crim. App. 2000) (quoting *Rogers v. State*, 853 S.W.2d 29, 33 (Tex. Crim. App. 1993)). The jury is entitled to know all relevant surrounding facts and circumstances of the charged offense. *Id.* But, under Rule 404(b), same-transaction contextual evidence is admissible only when the offense would make little or no sense without also bringing in that evidence, and it is admissible "only to the extent that it is necessary to the jury's understanding of the offense." *Id.* (quoting *Pondexter v. State*, 942 S.W.2d 577, 584 (Tex. Crim. App. 1996)).

"Whether extraneous offense evidence has relevance apart from character conformity, as required by Rule 404(b), is a question for the trial court." *Moses*, 105

S.W.3d at 627. Thus, a trial court's ruling on the admissibility of extraneous offenses is reviewed under an abuse-of-discretion standard. *Prible v. State*, 175 S.W.3d 724, 731 (Tex. Crim. App. 2005); *see Santellan v. State*, 939 S.W.2d 155, 169 (Tex. Crim. App. 1997). As long as the trial court's ruling is within the "zone of reasonable disagreement," there is no abuse of discretion, and the trial court's ruling will be upheld. *Prible*, 175 S.W.3d at 731; *Santellan*, 939 S.W.2d at 169. A trial court's 404(b) ruling admitting evidence is generally within this zone if there is evidence supporting that an extraneous transaction is relevant to a material, non-propensity issue. *Powell v. State*, 63 S.W.3d 435, 438 (Tex. Crim. App. 2001); *see Santellan*, 939 S.W.2d at 169. If the trial court's evidentiary ruling is correct on any theory of law applicable to that ruling, it will not be disturbed, even if the trial judge gave the wrong reason for his correct ruling. *Sewell v. State*, 629 S.W.2d 42, 45 (Tex. Crim. App. 1982).

At a pre-trial hearing, the State presented evidence that the charged offense and the extraneous offenses at issue were all part of a single "crime spree." The State argued that each of the episodes in the instant case, beginning with the burglary of a habitation and the theft of Brinlee's gun and ending with the robbery of DeHart, constituted one continuous episode because these extraneous offenses were necessary to properly explain what happened in Jonestown and to clarify the nature of the crime alleged. Although the State argued that it had no direct evidence that Appellant committed the Jonestown murders, they presented the evidence of each extraneous offense to prove the charged

crime and to illustrate the "crime spree" characterization of Appellant's acts. Further, omitting the extraneous offenses would make little or no sense and would be impractical because they are needed to tie Appellant to the crime. The trial court agreed, concluding that "[t]he evidence is so intermingled between all of the events that occurred it would just -- it would be impossible to do so without leaving a hole, leaving a gaping hole in the State's case. So the Court does find that this is one continuing course of conduct[.]" In a subsequent pre-trial hearing, the trial court reaffirmed its ruling.

We conclude that the trial court did not err. It was within the zone of reasonable disagreement to find the various offenses to be contextual evidence. Appellant did not rest between incidents, and the charged offense would make little sense without the extraneous offenses. The extraneous offense evidence presented showed that Appellant went to homes and establishments where he knew certain women would be found (with the exception of DeHart), specifically women with whom he had a personal relationship. Appellant deliberately stole a gun from the home of his friend Brinlee. After threatening Wilson with the gun and shooting it inside her home, Appellant stole Wilson's truck and one of her credit cards. He then drove Wilson's truck to O'Neill's in Marble Falls. There, all of the witnesses saw Appellant with the gun when he used it in an attempt to kill Purcell and in the murder of bartender Allred. All witnesses testified that no one else ever fired or possessed the gun. Appellant was seen fleeing Marble Falls alone in Wilson's stolen blue truck, and that very truck was present at the Jonestown crime scene.

This, along with ballistics evidence and DNA evidence, created more circumstantial evidence to establish the identity of Appellant as Faulkner's and Hensley's killer. The abandonment of Wilson's blue truck and the theft of Griffith's white Saturn were also part of this continuing episode.

Further, the theft of DeHart's blue Hyundai occurred during Appellant's flight from the instant offense as he attempted to travel to his mother's home in Shirley, New York. "[F]light is admissible as a circumstance from which an inference of guilt may be drawn." *Alba v. State*, 905 S.W.2d 581, 586 (Tex. Crim. App. 1995). And if "the extraneous offense is shown to be a necessarily related circumstance of the defendant's flight, it may be admitted to the jury." *Id.*; *see also Foster v. State*, 779 S.W.2d 845, 859 (Tex. Crim. App. 1989). Appellant was apprehended in Suffolk County, New York with DeHart's vehicle, the gun, Feltner's cell phone, and Wilson's credit card. The trial court did not err in holding that the instant offense was not fully understandable without the contextual evidence of the extraneous offenses.

We note that Appellant contends that, because "no one was challenging the State's version of events," the introduction of the extraneous crimes was unnecessary to prove identity or any of the other Rule 404(b) exceptions. This argument is without merit. Appellant did not plead guilty, and he argued at closing against a finding of guilt. When the identity of the perpetrator can be established by circumstantial evidence only, identity is a contested issue even if the defense rests with the State, puts on no evidence, and

raises no defensive theories. *See Jones v. State*, 568 S.W.2d 847, 858-60 (Tex. Crim. App. 1978). We also note that this argument is without merit because, aside from the identity issue, the State needed all of this evidence to give context to Appellant's "crime spree" as he stole the gun to go after women with whom he had had personal relationships and to then effectuate his flight to his mother's home. Point of error one is overruled.

In point of error two, Appellant argues that the trial court erred in "failing to give an individual limiting instruction as to each piece of extraneous offense evidence at the time it was admitted, denying him a fair trial." The record shows that the trial court denied Appellant's numerous requests for individual Rule 404(b) limiting instructions. However, at the end of trial, the trial court agreed to include a limiting instruction in the court's charge regarding the extraneous offenses that were admitted.

This Court has held that a limiting instruction is not required when evidence is admitted as same-transaction contextual evidence. *Castaldo v. State*, 78 S.W.3d 345, 352 (Tex. Crim. App. 2002); *Wesbrook v. State*, 29 S.W.3d 103, 114-15 (Tex. Crim. App. 2000). Because we hold that the trial court did not err in admitting the extraneous offense evidence as same-transaction contextual evidence, no instructions were required. Moreover, even though not required, the trial court included in the jury charge a limiting instruction on extraneous-offense evidence. Appellant's second point of error is overruled.

In his third point of error, Appellant contends that the trial court "erred in failing to

grant [him] a new trial, where prosecutor Gary Cobb threw one or more boxes of live rounds of ammunition into the jury box prior to the jury retiring to consider punishment." The record shows that after the jury retired to begin its deliberations, the following occurred:

> MR. WEBER [Defense Counsel]: All right. We're going to object to Mr. Cobb's conduct during early in the presentation -- early in the closing. He picked up live rounds, not shells, and poured -- from about a foot high poured -- where is [Mr. Erickson, defense counsel] -- I would say 50 rounds of ammunition on the bench directly in front of the jurors.

> And how many are in the jury box right now?

> MR. ERICKSON: About 12.

> MR. WEBER: There's 12 rounds that actually went into the jury box, live rounds.

> How many are on the bench in front of them?

> MR. ERICKSON: 15.

> MR. WEBER: There's 15 on the bench in front of them.

> He poured live rounds in front of the jury. He then walked over and held the gun out to [Appellant] and offered the gun to [Appellant]. He then brought records that I introduced that were in the record and slammed them down on the table directly in front of me.

> All of these actions violated the specific rules the judge told us and proper conduct. [The judge] gave us the rules. We all acknowledged we heard it. Absolutely improper. Absolutely outrageous conduct. Absolutely uncalled for.

> We have no problem with anything that was said against us, but this conduct was just completely outside the bounds of what is permitted in the law.

We ask, one, that Mr. Cobb be held in contempt of court; and we ask, two, for a mistrial.

THE COURT: Counsel has requested that that be placed on the record. And, State, if you wish to reply as well on the record, you may do so.

MR. COBB: Only to dispute Mr. Weber's accusation that I offered the gun to [Appellant]. I did not offer the gun to [Appellant]. I walked toward counsel['s] table with the gun. And I don't believe that I slammed the records down. I did put them on counsel['s] table.

The trial court declined to hold the prosecutor in contempt and denied Appellant's motion for mistrial.

Appellant did not object to the prosecutor's conduct or request an instruction to disregard when the conduct occurred, but instead moved for a mistrial after the jury had already retired to begin its deliberations. In so doing, Appellant failed to object at the earliest opportunity, and thus, he has preserved nothing for our review. Tex. R. App. 33.1(a). Point of error three is overruled.

In point of error four, Appellant contends that the trial court erred in failing to grant him a new trial where the State singled out Catholics for exclusion from the jury panel in violation of *Batson v. Kentucky*, 476 U.S. 79 (1986).[3] He avers that this is a case of first impression and asks this Court to reverse and remand his case for a new trial.

---

[3] During voir dire, Appellant challenged the prospective jurors' exclusion under *Batson* based upon the jurors' religion. While Appellant notes that each of the five prospective jurors was a minority, he did not assert at trial, or on appeal, that the State excluded these jurors because of race.

Appellant is incorrect.

We addressed this same issue in *Casarez v. State*, 913 S.W.2d 468, 495 (Tex. Crim. App. 1994) (op. on reh'g).  In holding that *Batson* challenges do not apply to peremptory strikes based upon religion, we stated that, by definition, a religious belief (unlike race or gender) is a subscription to a set of beliefs and convictions.  *Id.*  Strikes based on personal belief have long been recognized as appropriate and are, in fact, the foundation of the entire voir dire process.  *Id.*  In discussing the difference between striking jurors on the basis of race or gender versus religion, we stated,

> Attributing to women or African Americans as a group any specific moral, political, or social belief is overly broad because membership in the group does not depend upon subscription to the belief.  It is invidious because individual members who do not share the belief are made to suffer the attribution anyway.  But in the case of religion, the attribution is not overly broad, and therefore not invidious, when the belief is an article of faith.  Because all members of the group share the same faith by definition, it is not unjust to attribute beliefs characteristic of the faith to all of them.

*Id.* at 496.  Appellant raises nothing to persuade us to revisit our holding in *Casarez*. Point of error four is overruled.

In Appellant's fifth point of error, he claims that the evidence is insufficient to demonstrate that he would be a future danger in prison and that the testimony concerning the "incompetency" of TDCJ (*i.e.*, TDCJ's failure to protect its inmates from drugs, alcohol, and violence) violated his right to individualized sentencing.  Appellant concedes in his reply brief that this fifth point of error is redundant of points of error eight and nine. He asks that the argument and authority contained in point five be incorporated into point

of error nine and that point of error five no longer exist as a separate point of error. We will grant Appellant's request.

In point of error six, Appellant claims that it is unconstitutional to sentence a mentally ill person to death. Appellant asserts that the testimony of his mental-health experts shows that he has borderline intellectual functioning; he also notes that he was held to be incompetent to stand trial prior to the restoration of his competence and subsequent trial. Citing *Atkins v. Virginia*, 536 U.S. 304 (2002) (banning the execution of mentally-retarded offenders), and *Roper v. Simmons*, 543 U.S. 551 (2005) (banning the execution of juvenile offenders), he argues that these decisions should be extended to protect the mentally ill from execution. Appellant concedes that he is not mentally retarded or a juvenile.

We recently addressed this issue in *Mays v. State*, 318 S.W.3d 368, 379-80 (Tex. Crim. App. 2010). Quoting our previous caselaw, we stated that "there is no authority from the Supreme Court or this Court suggesting that mental illness that is a 'contributing factor' in the defendant's actions or that caused some impairment or some diminished capacity, is enough to render one exempt from execution under the Eighth Amendment." *Id.* at 379. As in *Mays*, Appellant cites no cases from any American jurisdiction that hold that the *Atkins* rule or rationale applies to the mentally ill. *See id.* Nor has he demonstrated that there is a trend among state legislatures to categorically prohibit the imposition of capital punishment against mentally ill offenders. *See id.* Finally,

Appellant fails to show that, if he did suffer from some mental impairment at the time of these murders, his impairment was so severe that he is necessarily and categorically less morally culpable than those who are not mentally ill. *See id.* at 379-80. As Appellant has raised nothing new to persuade us to revisit our previous decision, we overrule point of error number six.

In point of error seven, Appellant avers that the trial court erred in not allowing the defense to question venire person Jacqueline Lambert prior to her being struck for cause. Appellant argues that it was unconstitutional under *Witherspoon v. Illinois*, 391 U.S. 510 (1968), and *Wainwright v. Witt*, 469 U.S. 412 (1985), to prevent him from attempting to rehabilitate a potential juror who had qualms against the death penalty.

During voir dire questioning by the State, Lambert stated that she was opposed to the death penalty under any circumstances and that she could not set aside her principles and follow the law. When the State asked if she would still vote for a life sentence no matter how horrible the crime, Lambert responded as follows:

> A.     Yes, I know. I know because I know -- I know it's a horrible crime and I know. And I don't mean to -- I mean, like the judge said, this is the time that I can speak. We didn't get down to the next section [of the questionnaire], which I think has a lot of bearing on my case, on my feelings being here also, is that I live out on the North Shore. I know what a horrible thing this was because it was in the papers, and I know -- and at the time I read everything. We had just moved there. It was just horrible.
>
>     And when I -- when the judge asked when I was here before, I thought I could really be objective in this case, but I drove home that day and I went through Jonestown, which I do every day, in and out, and I thought I just don't know that I could be as objective as I thought I could.

And I feel really bad about this.

So, it's not just my indecision -- not indecision, but my feeling on the death penalty. My other thing is that I live in that area where there are a lot of other people that were impacted by this.

Lambert went on to note that at the time of the murders, she discussed the case with other people in the area and read extensively about the case. She stated that all of the information that she had received had caused her to form an opinion regarding Appellant's guilt and that it would interfere with her ability to sit on the jury.

After the State passed the prospective juror, the trial court questioned Lambert:

Q. [THE COURT]: Let me ask the question in the way we need to have it asked. Based on the information that you have heard in the media or read in the media, have you formed an opinion as to the guilt or the innocence of the defendant in this case?

A. Yes.

Q. Would that opinion that you have formed as to his guilt or innocence affect your verdict?

A. Yes.

The trial court excused the juror.

Appellant objected to Lambert's excusal, arguing that the State did not properly prove the reason for her excusal under Article 35.16 and that the defense had no opportunity to rehabilitate her. The trial court explained,

Frankly, I think the law says that once she answers the pretrial publicity question, which I have an obligation, the Court can on its own motion ask that question once there are facts that indicate that the juror may have a bias or prejudice, which I think the State was attempting to do. But

if it was not asked in the right form for the record, I think the Court has an obligation to do so.

And I think the law says, since you-all are so familiar with [article] 35.16 and of the sections [sic], that once she answers that question in such a way that it indicates that her verdict would be affected, that we can question her no more.

In response to Appellant's objection, the State moved Lambert be struck for cause. The trial court granted the State's challenge for cause, noting, "I'm doing what [article] 35.16 mandates that has to be done once her answer is clear."

Article 35.16(a)(10) states, in pertinent part, that a juror may be struck for cause for the following reason:

That from hearsay, or otherwise, there is established in the mind of the juror such a conclusion as to the guilt or innocence of the defendant as would influence the juror in finding a verdict. To ascertain whether this cause of challenge exists, the juror shall first be asked whether, in the juror's opinion, the conclusion so established will influence the juror's verdict. *If the juror answers in the affirmative, the juror shall be discharged without further interrogation by either party or the court.*

(Emphasis added). Following the State's questioning of Lambert, the trial court had the discretion to clarify Lambert's position by asking further questions. *See Heiselbetz v. State*, 906 S.W.2d 500, 510 & n.13 (Tex. Crim. App. 1995). Once clarified, however, any further questioning was proscribed by statute. *Id*. at n.13. Accordingly, the trial court did not abuse its discretion in dismissing Lambert.

We also note that Appellant's reliance on *Witherspoon* and *Witt* is misplaced. As summarized by Appellant, *Witherspoon* and *Witt* stand for the proposition that a

defendant has the "right to an impartial jury drawn from a venire that has not been tilted in favor of capital punishment by selective prosecutorial challenges for cause." *See Witherspoon*, 391 U.S. at 521-23; *Witt*, 469 U.S. at 418-21. Here, Lambert was not discharged because of her opposition to the death penalty, but rather because she clearly indicated that her conclusion as to Appellant's guilt or innocence would influence her verdict. The trial court did not err in excusing Lambert without additional questioning. Point of error seven is overruled.

In point of error nine, Appellant complains that "a large portion of the State's case at punishment was unfair because it concerned factors outside of Appellant's control or unrelated to Appellant's personality." Citing *Lockett v. Ohio*, 438 U.S. 586, 604-05 (1978), Appellant complains that testimony concerning the "incompetency" of TDCJ (*i.e.*, TDCJ's failure to protect its inmates from drugs, alcohol, and violence) violated his right to individualized sentencing under the Sixth, Eighth, and Fourteenth Amendments.

Appellant argues, in both his brief and his reply brief, that he was denied individualized sentencing "mostly due to the testimony of A.P. Merillat, which holds [Appellant] responsible for TDCJ's total incompetence in keeping anybody who enters its doors safe." Evidence at both the guilt and punishment phases showed that Appellant used drugs and alcohol and that he was more violent when he did so. At punishment, Merillat, a senior criminal investigator for the Texas Special Prosecution Unit, testified that inmates in Texas prisons have access to drugs, alcohol, and weapons. He further

testified that many violent crimes occur inside Texas prisons both in the general population and on death row. Merillat noted that he knew nothing about Appellant or his case, and that he was not opining as to whether Appellant would be a future danger.

Appellant did not object at trial to the admission of the complained-of evidence on constitutional or other grounds. Therefore, he presents nothing for our review. Tex. R. App. 33.1(a). Further, even if Appellant preserved error, we have previously rejected similar arguments. *See Jenkins v. State*, 912 S.W.2d 793, 818 (Tex. Crim. App. 1995) (on motion for reh'g) (determining that "evidence about the availability of drugs in prison was relevant to show appellant could be just as dangerous in prison society as he is in nonprison society where drugs are freely available"); *see also Coble*, 330 S.W.3d at 287-89 (rejecting the appellant's claim that the trial court erred by admitting Merillat's testimony about the Texas prison-classification system and violence in prison).

Appellant also complains that Dr. Richard Coons testified, based upon a two-hour interview with Appellant, that Appellant blamed "the gun" for the crime, and that there is a "ready availability of weaker victims" in the prison system. Citing *Coble*, he argues that this Court has found that "Coons is not competent to testify as an expert witness on future dangerousness, which his own profession does not recognize, in a capital murder case at punishment because his testimony is unreliable under the Eighth Amendment." *See Coble*, 330 S.W.3d at 270-79.

The record shows that Appellant filed a pre-trial motion for a *Daubert*[4] hearing. However, no hearing was held. The motion did not specify any expert to which it was directed. Appellant also made no objections at trial to Coons's qualifications or competency as an expert; nor did he make any constitutional challenges regarding the admission of Coons's testimony. Appellant does not present any argument on appeal as to why Coons was not competent to testify in this case. Therefore, Appellant has preserved nothing for this Court to review. Tex. R. App. 33.1(a). We also note that Appellant misquotes our opinion in *Coble*. We did not hold that Coons's testimony in *Coble* violated the Eighth Amendent; rather, although Coons's testimony was not sufficiently reliable under Texas Rule of Evidence 702, we held that its admission was not harmful as it did not affect the appellant's substantial rights to a fair sentencing trial. *Coble*, 330 S.W.3d at 287. We further noted that the Supreme Court has held that future dangerousness expert testimony such as that provided by Coons meets the "heightened reliability requirement of the Eighth Amendment." *Id.* at 270 (citing *Barefoot v. Estelle*, 463 U.S. 880 (1983)).

We further note that, even if the trial court had erred in admitting Coons's testimony, Appellant's substantial rights to a fair sentencing trial were not violated. Unlike in *Coble* where Coons had lost his notes documenting his interview with the defendant and had no independent memory of that interview, here Coons interviewed

---

[4] *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579 (1993).

Appellant and based his opinion regarding future dangerousness upon that interview in addition to pertinent records regarding Appellant and this case. *See Coble*, 330 S.W.3d at 278-79. Moreover, Coons's future dangerousness opinion was similar to the opinion of Appellant's own expert, psychiatrist Dr. Robert Cantu. Cantu testified that if Appellant (1) had access to large amounts of drugs or alcohol, (2) had the opportunity to harm someone weaker than himself, and (3) was in a relatively unstructured environment, then Appellant would be a future danger in prison. Further, both experts agreed with the diagnosis that Appellant has "intermittent explosive disorder." As set forth in point of error eight, above, even without Coons's testimony, there was ample evidence that there was a probability that Appellant would commit future acts of violence. Finally, the State mentioned, but did not emphasize, Coons's complained-of testimony during closing arguments. Point of error nine is overruled.

We affirm the trial court's judgment.

Hervey, J.

Delivered: December 14, 2011

Publish