

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-19-00168-CR

_____

JAMES DALE MOURNING, Appellant

V.

THE STATE OF TEXAS

On Appeal from Criminal District Court No. 1
Tarrant County, Texas
Trial Court No. 1590988R

Before Sudderth, C.J.; Gabriel and Kerr, JJ.
Memorandum Opinion by Justice Kerr

**MEMORANDUM OPINION**

In this appeal of an assault-by-strangulation conviction, Appellant James Dale Mourning complains of the sufficiency of the evidence and the admission of evidence of his illegal-drug use. Because we find the evidence sufficient to uphold his conviction for strangling his ex-wife, Joannie, and that the trial court did not reversibly err by allowing evidence of his illegal-drug use, we affirm the trial court's judgment.

**Background**

## I. Joannie and James's volatile relationship

Joannie and James shared a tumultuous, drug-and-alcohol-fueled relationship since the early nineties, including two marriages. After their first divorce in 2000, Joannie became sober, held down a good job, and was close with her two adult sons, her daughter-in-law, and her grandchildren.

Unfortunately, Joannie's life again took a turn for the worse when she and James reconnected in 2015 and remarried in 2016. At trial, she described how controlling James became—Joannie was required to work outside the home to pay for their rent, while James stayed home, did drugs, and invited mistresses over for the day while Joannie was at work. According to Joannie, this led to arguments over "[d]rugs and girls," with James cursing at her and calling her profane names; Joannie told the jury, "I kind of thought I should have changed my name on my birth certificate to B****."

Eventually, the abuse became physical. Joannie described the first time James choked her, testifying, "He came up to me, I was in the kitchen, and he put his hand

right here and lifted me up right next to the kitchen counter, the cabinets of the kitchen and was yelling at me." Another time, he slapped her when she lent her car to his son, Jamie; she recalled that the slap was so strong it knocked her to the floor. Joannie described how James used her car as a means of control: he would often take the car when she got home and leave her alone at the house, and he would take away her keys and her phone when they argued.

Joannie recalled finding James with another woman in the mother-in-law cottage behind their house early one morning. After she confronted James, he kicked her coffee out of her hand and then followed her into the main house, yelling, "B****, I said get to work." James slapped her again—so hard that, according to Joannie, "everything went black." Photos of Joannie with a black eye purportedly left by the slap were admitted and shown to the jury.

The incident giving rise to this prosecution took place in the early morning hours of July 29, 2017. According to Joannie, James became upset with Joannie after she attempted to confront one of his mistresses. They argued, and at some point when James left, Joannie went outside and rummaged through his motorcycle saddlebags looking for her cell phone; in the process, she took out a couple of his shirts and threw them on the ground. When she later refused to pick up the shirts, James became incensed and choked her in their kitchen:

> His face was red, and he came up to me - - he came - - I don't know how
> he got there so fast. He came from that point to where I was, and he had

his hands up. And when I saw a hand - - his hands, I knew what he was going to do. And he started choking me.

So I started fighting back. And he had me in a headlock. He got me down to the ground. And every time I'd try to get up, he'd - - he'd kick me or put his foot on my chest and say, B****, I said stay down, or, C***, stay down.

Joannie could not recall how long he choked her or if she lost consciousness, but she did remember urinating on herself. When she started to get up, James kicked her in her ribs and put his foot on her chest; when she tried again, he punched her in the nose, causing an audible pop and a gush of blood. Joannie was also bleeding from a "gash" on her leg by that point. She remembered that James was more concerned with the blood on the floor than her well-being and that he told her, "B****, get in there and wipe your face. Get that blood off your face."

Joannie averred that James forced her to wash her face before he left her alone, at which point she took pictures of her injuries because "it was so horrible" and she "wanted him to see what he did." The photos, which were admitted and shown to the jury, show a bruise and cut across the bridge of her nose, a bloody cut on her leg, bruising on her arms, and the blood-stained tank top and shorts she was wearing during the fight. Joannie did not call the police that night because she did not want James to get in trouble and she was not ready to be on her own.

The next evening, Joannie attended her grandchild's birthday party and told her son Michael about the previous night's fight. Michael convinced her to speak to his longtime friend Fort Worth Police Detective Ryan Nichols, who was also at the party.

Detective Nichols recalled at trial that Joannie had a visible black eye, bruising on her forearms, and "a cut or very severe abrasion" on one leg. He described her as appearing embarrassed and ashamed and staring at the ground during their conversation, demeanor he described, based on his experience, as consistent with that of a domestic-violence victim. He encouraged her to file a police report but noted that she "seemed scared" of retaliation when he described the reporting process because "[s]he had already [been] told that she would have been hurt if she called the police and filed a report."

In the next several days, concerned family and friends requested two welfare checks on Joannie, but both times Joannie told the responding officers that nothing was wrong. At trial, she explained that she did so out of fear of retribution by James.

Joannie finally reported the July 29 choking incident on August 8. She met Officer Thomas Shelton and his partner in a Walmart parking lot, where they took her written statement and photos of her injuries. Officer Shelton described Joannie as "not really calm, . . . still fearful" and "hesitant and kind of reluctant." This did not surprise Officer Shelton, who described family-violence victims as often being reluctant to speak with police because they are afraid of what will happen and are afraid to leave their abuser. Officer Shelton noted that Joannie's descriptions of the assault to him, to his partner, and in writing were consistent and included details that led him to find her credible. He noted her injuries in his report and photos: bruising on her forearms and

her hand, a scratch on the bridge of her nose, and a cut and bruising on her left shin. The photos were admitted and shown to the jury.

## II. The arrest and trial

James was arrested and charged with third-degree-felony family-violence assault by impeding Joannie's breathing or circulation. *See* Tex. Penal Code Ann. § 22.01(b)(2)(B). At trial, his defensive strategy was to question Joannie's credibility by emphasizing her reunification with James after his arrest, her delay in reporting to police, and her lack of any visible bruising on her neck despite taking blood thinners for an unrelated medical condition.

Though they were divorced by the time of trial, Joannie did reunite with James after his arrest. At trial, she admitted violating a protective order by visiting him in jail, accepting his calls from jail, and writing him love letters. James persuaded Joannie to execute an affidavit of nonprosecution in which she recanted her accusations of abuse and alleged that she had been under the influence of antidepressants and alcohol at the time of the incident, distorting her memory of what had happened. At trial, she clarified that this was untrue and that she "knew exactly what was going on" despite being on antidepressants and illegal drugs. She testified that she filed the affidavit of nonprosecution because she just wanted him to "straighten up and be the old person that [she] knew he could be." She later broke up with James and got sober again in October 2018.

To rebut James's arguments attacking Joannie's credibility, such as her reluctance to report and her affidavit of nonprosecution, the State offered expert testimony by Kathryn Jacob, an executive at SafeHaven, a local family-violence center. Jacob described the cycle of abuse and the use of power, control, intimidation, isolation, and emotional abuse to control the victim. She said it was "very common" for victims to become withdrawn from their family and reluctant to attend family events, due to a combination of fear of confrontation, embarrassment, and shame about their abusive relationship, and she acknowledged that it is "not easy" for victims to speak up about the abuse.

In Jacob's experience, most victims did not want the relationship to end—they just wanted the abuse to stop—and this made them reluctant to report the abuse. Wanting to keep their partners out of trouble, victims may also be disinclined to reach out to law enforcement. If victims still love their partners or fear a backlash, they may keep quiet. They may lie to police to keep themselves safe and hide the abuse. And once they do report abuse, it is "very common" for victims to bail their abusers out of jail, reunite with their abusers, and even to execute nonprosecution affidavits. In fact, Jacob averred that it "takes six to nine attempts for a victim to end the relationship permanently."

James also attempted to weaken Joannie's credibility by pointing to her use of blood thinners to explain the severity of the bruises on her arms and to undermine her choking allegation, which, he argues, should have left telltale signs of bruising on her

7

neck. But Joannie testified that the blood thinners caused bruising mostly on her arms and hands. And Officer Shelton, Detective Nichols, and Nurse Maryann Contreras of John Peter Smith Hospital testified that an absence of neck bruising is not uncommon in strangulation cases. Officer Shelton and Detective Nichols both testified to their direct experience and their knowledge of case studies indicating that choking victims, even in fatal incidents, do not always sustain visible injuries or bruising to their necks. This testimony was echoed by Nurse Contreras, who attested to reports in peer-reviewed journals that most people do not sustain visible injuries due to strangulations, even in fatal scenarios.

The jury found James guilty, and the trial court sentenced him to 30 years' incarceration.

## Discussion

In his first point, James attacks the sufficiency of the evidence supporting his conviction. In his second, he asserts that the trial court abused its discretion by allowing evidence of his drug-use history as contextual evidence. We disagree with him on both points.

## I. Sufficiency of the evidence

In his argument that the evidence is insufficient to support the conviction, James's focus is selective: he refers us only to the evidence that he believes undermines Joannie's story of the choking incident. But he applies the wrong standard. In our evidentiary-sufficiency review, we view all the evidence in the light most favorable to

the verdict to determine whether any rational factfinder could have found the crime's essential elements beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); *Queeman v. State*, 520 S.W.3d 616, 622 (Tex. Crim. App. 2017).

Applying this standard, the evidence showed that James choked Joannie with his hands during their July 29 argument, impeding her breath. Joannie's testimony detailed the fight, and the jury saw photos of her injuries taken immediately afterward and more than a week later when she reported the assault. Detective Nichols described seeing her injuries. Officer Shelton noted the consistency of her verbal and written statements and believed that she was credible.

James asserts that Joannie's reluctance to report and her later recantation, her possible drug and alcohol use on the day of the incident, and her lack of bruising all undermine her credibility, but it was the jury's responsibility as the factfinder, not his as the accused, to resolve any such conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *See Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789; *Queeman*, 520 S.W.3d at 622. Nor may we re-evaluate the evidence's weight and credibility and substitute our judgment for the factfinder's. *Queeman*, 520 S.W.3d at 622. The jury was free to believe Joannie and to consider Jacob's, Officer Shelton's, Detective Nichols's, and Nurse Contreras's additional

9

testimony about how victims respond to domestic violence and about how choking victims may not exhibit any bruising.

Having evaluated the evidence in the light most favorable to the verdict and finding it sufficient to support the conviction, we overrule James's first point.

## II. Evidence of James's drug use

James argues that the trial court abused its discretion by overruling his Rule 404(b) and Article 38.371 objections to evidence of his history of drug abuse. We will review this complaint for an abuse of discretion and will disturb the trial court's ruling only if it is outside the zone of reasonable disagreement. *See Devoe v. State*, 354 S.W.3d 457, 469 (Tex. Crim. App. 2011). A trial court's Rule 404(b) ruling admitting an extraneous transaction is generally within this zone if it is relevant to a material, nonpropensity issue. *Id.* (citing *Powell v. State*, 63 S.W.3d 435, 438 (Tex. Crim. App. 2001)). We will uphold the trial court's ruling if it is correct on any applicable legal theory, even if the trial judge gave the wrong reason for its ruling. *Id.* (citing *Sewell v. State*, 629 S.W.2d 42, 45 (Tex. Crim. App. 1982)).

In a pretrial hearing, James's counsel objected to testimony about his "drug use and drug history" as "improper 404(b) and character evidence and that [his] drug use or drug habits do[ not] fall under the Article 38.371 [exception], going to the nature of the relationship, having anything to do with certain offenses involving family violence." The State countered that drug-use evidence was relevant because it was "contemporaneous to the violent and bad acts committed against [Joannie]"; was

evidence of motive, mental state, and the nature of their arguments; and was "almost contextual to his bad acts and a lot of the problems that were in the home leading up to the violent acts." The trial court overruled James's objection and permitted the State "to put on evidence of drug use that is contextual to the extraneous crimes or bad acts committed against [Joannie]."

On appeal, James argues that evidence of his drug history was impermissible character-conformity evidence and that it was not contextual to the charged offense. The State argues that James forfeited his complaint because it does not comport with his objections at trial that the evidence is inadmissible under Rule 404(b) or Article 38.371. We disagree with the State because it misconstrues James's argument and the nature of contextual evidence as an exception to Rule 404(b)'s prohibition of extraneous-offense evidence.

Article 38.371 allows evidence of "all relevant facts and circumstances" that may assist a trier of fact in a family-violence prosecution, including evidence "regarding the nature of the relationship between the actor and the alleged victim." Tex. Code Crim. Proc. Ann. art. 38.371(b). But it does not allow the admission of "character evidence that would otherwise be inadmissible" under the evidentiary rules. *Id.* art. 38.371(c). In turn, Rule 404(b) precludes the admission of evidence of a crime, wrong, or act to prove a person's character in order to show the person acted in conformity with that character on a particular occasion, but it does allow for such evidence to be admitted for "another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge,

identity, absence of mistake, or lack of accident." Tex. R. Evid. 404(b). This list of examples is not exclusive; for instance, another such exception is "same-transaction contextual evidence." *Mayes v. State*, 816 S.W.2d 79, 86–87 (Tex. Crim. App. 1991). Such evidence is so intertwined with the State's proof of the charged crime that avoiding reference to it would make the State's case incomplete or difficult to understand. *See Devoe*, 354 S.W.3d at 470.

Bringing us full circle, Article 38.371(b) provides another such exception by expressly allowing evidence "regarding the nature of the relationship between the actor and the alleged victim." Tex. Code Crim. Proc. Ann. art. 38.371(b). James's history of drug use—and Joannie's—gave the jury insight into the nature of their volatile relationship. As Joannie testified, most of their arguments and issues were a result of their drug use—she testified that their "drug friends" staying at their home caused problems, that James was abusing drugs and alcohol when he first assaulted her, that she did not call the police because there were drugs in the home, and that Joannie was mad at James on the night of the charged assault in part because of "the drugs." The trial court therefore did not abuse its discretion by allowing the evidence of James's drug abuse as it was relevant to explaining the nature of their relationship. We overrule James's second point.

## Conclusion

Having overruled both of James's points, we affirm the trial court's judgment.

12

/s/ Elizabeth Kerr
Elizabeth Kerr
Justice

Do Not Publish
Tex. R. App. P. 47.2(b)

Delivered:  October 22, 2020