**Affirmed and Memorandum Opinion filed August 21, 2012.**



In The

# Fourteenth Court of Appeals

———————————————

## NO. 14-11-00533-CR

———————————————

**ANTONIO LUIS GARCIA, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

**On Appeal from the 149th District Court**
**Brazoria County, Texas**
**Trial Court Cause No. 63,635**

## MEMORANDUM OPINION

Appellant, Antonio Luis Garcia, was charged with two counts of the felony offense of burglary of a habitation with intent to commit theft. Tex. Penal Code Ann. § 30.02(a) (West 2011). The jury acquitted appellant of the first count but found him guilty of the second. The jury assessed appellant's punishment at fifteen years' confinement. Appellant now challenges his conviction on appeal. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

Appellant and Lisa Padilla began a romantic relationship in November of 2007. Before the on-again, off-again relationship came to a final conclusion sometime around July of 2010, the two had lived together several times in two different residences. However, once the romantic relationship came to an end, appellant continued to have hopes that the romantic relationship would resume and as a result, he continued to make contact with Padilla. Padilla on the other hand testified that once the relationship had ended, she wanted to be left alone and that appellant no longer had permission to enter her Pearland residence.

In September of 2010, Padilla began dating another man. It was after that new relationship started that Padilla began having trouble with appellant. On October 2, 2010, appellant sent Padilla a text message that he had pictures of Padilla naked. This text message confused Padilla as she had never allowed those type of pictures to be taken of her. Upset, Padilla deleted the text message.

Later that same night or the next day, appellant sent another text message telling Padilla he had left something for her on her jeep. Padilla was not at her house when she received the second text message. When she returned home on October 3, 2010, Padilla found her camera on her jeep, but without the battery or the memory card. After receiving the second text message, Padilla began to realize that appellant was referring to pictures she had taken of herself to track the healing process after breast augmentation surgery. Padilla testified that she kept her camera on her nightstand and that she never sent appellant any of the pictures of her recovery from surgery. She also testified that the only way appellant could have learned about the pictures was by taking her camera. Appellant filed a report with the Pearland Police Department.

The next day was Monday, October 4, 2010 and Padilla went to work. While on her lunch break, Padilla followed her normal routine and went to a nearby Ross store. As she entered the Ross, appellant approached and grabbed her. Appellant indicated he wanted to talk to her. Padilla kept moving and asked appellant about her memory card. Appellant said he was sorry and then gave her the memory card. Appellant also explained that he got into her house through the open back door.[1] Appellant then continued to follow Padilla around the store until she threatened to call the police. At that point, appellant left.

That same day Padilla's house was broken into again. Padilla testified that an internet cable, television remote, and a bag of Padilla's panties were missing. Padilla later revealed that a sex toy was also missing but she had been too embarrassed to include it in her report to the police. Padilla noticed that her bathroom window was cracked, glass was on the floor, and it looked like it had been pried open. Padilla testified that the window was always kept locked.

Monica Perez was a close friend of Padilla's who had met appellant a single time. Sometime in October of 2010, appellant called Perez on the telephone and wanted to talk about Padilla. During the conversation, appellant admitted that he had entered Padilla's house and took her camera, panties, and sex toy. Appellant told Perez that he had entered Padilla's house through the bathroom window. Appellant also told Perez that he had returned Padilla's camera. During the remainder of the conversation, appellant discussed personal things about Padilla such as her housekeeping skills and her plastic surgery. Appellant also talked about how he loved Padilla and wanted to marry her. Finally, appellant mentioned that he had seen some before and after pictures of Padilla's breast

---

[1] Padilla testified she believed appellant's explanation for how he entered her house because her daughters frequently leave the back door unlocked.

3

augmentation surgery, was upset about them, and thought she was going to show them to other people.

Armando Godoy is Padilla's father. Godoy testified that he knew appellant and had talked to him on several different occasions. Godoy then talked about the last time he spoke with appellant. According to Godoy, appellant came to his house and told him that he had broken up with his daughter. Appellant also told Godoy that he had gotten angry at Padilla and had broken into her house and had stolen her camera. Appellant told Godoy that he wanted to get back together with Padilla. Godoy told appellant that Padilla did not want anything to do with him and that it would be best if he left her alone.

Two Pearland police officers responded to the burglary calls at Padilla's residence. Officer Josh Comer was dispatched on October 3, 2010 to Padilla's house. Once Comer arrived, Padilla described how appellant had called her earlier in the day and discussed having her camera and that he wanted to see pictures of her breast augmentation surgery. Padilla then told Comer that when she got home, she found her camera sitting on her jeep parked in her driveway. Comer took a report. After he returned to the police department, Comer called appellant to get his side of the story, but he did not answer. Comer left a message indicating that appellant was not allowed back on Padilla's property.

Officer James McGuire testified that he was dispatched to investigate a burglary call at Padilla's residence on October 4, 2010. McGuire spoke to Padilla and learned that someone had forced entry into the house through the bathroom window on the back side of the house. According to McGuire, Padilla reported several items were missing and that this indicated to him that the person responsible was someone close to Padilla.

The State next called Officer Robert DeSilva to testify. DeSilva took a voluntary statement from Monica Perez. Based on the information DeSilva had received regarding

4

the burglaries at Padilla's residence, appellant was his main suspect. DeSilva forwarded all the information he had regarding the burglaries to the Pearland detectives.

Finally, the State called Detective Jeffrey Journagin to testify. Detective Journagin testified that he received all of the information the patrol officers had gathered regarding the burglaries at Padilla's residence. In his opinion, the evidence pointed to appellant as the person who had committed the burglaries.

As he did with each of the police officers, on cross-examination, appellant questioned Detective Journagin about the thoroughness of the police investigation. During that cross-examination, Detective Journagin admitted that, as part of his investigation, he did not (1) obtain a single search warrant; (2) interview a single witness; or (3) visit the scene of the alleged burglaries. Instead, Detective Journagin testified that he gathered the reports prepared by the other police officers and sent them on to the district attorney's office. Following that cross-examination, on re-direct, the State asked Detective Journagin:

> Q.    Based on your professional opinion, doing this for 16 years, did you feel like anything else needed to be done in this case?
>
> A.    I wanted to follow up a little bit further and speak to [appellant], but he didn't want to talk to me.

Appellant objected that the quoted testimony "violated [his] Fifth Amendment Rights by testifying that [Journagin] asked to interview him and … [appellant] didn't want to speak to him." The trial court sustained appellant's objection and then instructed the jury: "Ladies and gentlemen of the jury, you'll be instructed to disregard the answer to that last question." The trial court then denied appellant's motion for a mistrial. At that point, the State rested.

Appellant called Raquel Rooney, appellant's mother, to testify. Rooney testified that appellant was living with her in the Woodlands at the end of September, 2010. Rooney also testified at length about the car problems appellant experienced at the end of September, 2010. According to Rooney, appellant's vehicle broke down and appellant worked on it in her driveway from September 27th through September 29th. Rooney also testified appellant was at his grandfather's birthday celebration on Friday, October 1, 2010, and Saturday, October 2, 2010 and that he spent the night in the Woodlands on Saturday.

On cross-examination, Rooney testified that appellant's relationship with Padilla had ended when he moved in with her in the Woodlands. Rooney admitted appellant had gotten his truck repaired so that it was drivable by September 29, 2010. Rooney also admitted that she was at work on October 1, October 2, and October 4, 2010 and as a result, she was not actually aware of her son's whereabouts on those days.

Appellant elected to testify in his own defense. Appellant stated that he and Padilla lived together on multiple occasions beginning in February of 2008. Appellant admitted he moved out of Padilla's residence for the final time in June of 2010 and the final break-up occurred right after Labor Day in September of 2010. Appellant testified that he contracted a sexually transmitted disease, which he discovered in September of 2010. Appellant believed he had contracted the disease from Padilla and as a result he wanted to talk to Padilla about it, but she refused to discuss it. Despite Padilla's refusal to discuss the issue with him, appellant testified he continued to make contact with her as part of his effort to discuss the disease with her. Appellant also testified that he believed his efforts to confront Padilla about the sexually transmitted disease directly led to her making the burglary charges against him.

Appellant testified he learned that Padilla was dating another man on October 1, 2010. Appellant stated that he returned a memory disk of pictures that he claimed contained naked pictures of the two of them. According to appellant, he talked to Padilla

6

about the pictures and he told her he would leave the disk on her jeep. As to why he returned the pictures to Padilla, appellant explained that it was part of his effort to reconcile with Padilla and that he was:

> [t]rying to be honest … I felt that she was being involved with somebody else, was probably going to use her. I cared for her very much and didn't want anybody else hurting her, hampering our situation. I wanted to find out more about our medical issue, work things out together. And by bringing this disk back to her, showing her at least I could be honest with her and straightforward with her and her not being able to hide something as she was hiding this medical issue from me.

Appellant then explained his car problems and he admitted that he had his truck repaired and operable by September 29, 2010. Turning to the events of early October, appellant testified that he planned to have lunch with Padilla on Friday, October 1 but it did not happen because unbeknownst to him, Padilla had changed her work lunch schedule. When that lunch did not happen, appellant testified he travelled to his aunt's house for his grandfather's birthday celebration. Appellant denied having any contact with Padilla on October 3, 2010. While he initially denied having contact with Padilla on October 4th, he later clarified that was the day he met Padilla at the Ross store. According to appellant, he knew Padilla's lunchtime routine and he parked outside the Ross and when she drove up, he approached her. Appellant testified that he wanted to discuss his medical issue with Padilla. Appellant also testified that he returned the key to Padilla's house during that meeting. According to appellant, while they were

> … walking from the parking lot into Ross, we were discussing – I was upset still over having her a new boyfriend and this medical issue as well. So I wanted answers. I wanted to see her tests as well, her results, and I was not getting any kind of truthfulness back at that time.

Appellant testified he broke off the meeting with Padilla at Ross when Padilla threatened to call the Houston Police.

7

Appellant denied going into Padilla's house from September 22, 2010 through October 4, 2010. Appellant also denied that Padilla contacted him regarding any allegations that he had entered Padilla's house without permission and took underwear, a cable, and a sex toy. Appellant admitted that he called Padilla's father on October 3, 2010. According to appellant, he called Godoy on the telephone in an effort to get back together with Padilla.

Prior to the start of the State's cross-examination of appellant, the State approached the bench regarding whether they would be allowed to cross-examine appellant regarding two extraneous offenses. The State asserted appellant's direct testimony opened the door to this cross-examination. The first extraneous offense involved an alleged criminal mischief incident in which the State asserted that appellant vandalized Padilla's new boyfriend's car outside Padilla's house. The trial court did not allow the State to inquire into that incident.

The second extraneous offense related to a third burglary incident on October 10, 2010. In the third alleged burglary, the State asserted that appellant turned off the electricity to Padilla's house, kicked in the back door, and then entered the kitchen of the house. According to the State, Padilla's daughter noticed the lights go out, heard the door kicked in, and then heard someone in the kitchen. The daughter called the police and upon their arrival on the scene, the police did not find an intruder inside the house, but did spot appellant's empty vehicle parked behind Padilla's house. Appellant was eventually arrested on a traffic offense after he returned to the vehicle later that night. Appellant objected under Rules 403 and 404(b) of the Texas Rules of Evidence. The trial court overruled those objections but did grant appellant's request for a limiting instruction.

The State began its cross-examination of appellant by immediately asking appellant if he was at Padilla's house on the evening of October 10, 2010. At that point, appellant

8

re-urged his objections, which the trial court overruled. The trial court then gave the following limiting instruction:

> Ladies and gentlemen of the jury, you may hear some testimony in regard to a – an offense that is extraneous to the allegations before you as indicted. If you hear that testimony, you're not to consider the evidence of that offense unless you believe beyond a reasonable doubt that that offense, in fact, occurred. And even then, you are only to consider the evidence for the limited purposes of determining whether or not, if it does, it rebuts a defensive theory, it goes to motive, opportunity, intent or plan of the defendant.

Following that instruction, appellant admitted that he parked his vehicle behind Padilla's house on the evening of October 10, 2010. Appellant then denied that he broke into Padilla's house, cut the electricity off, or cut the telephone line. Appellant testified that after he parked his truck behind Padilla's house, he left the area and went somewhere else. Appellant admitted that he later returned to his truck and that he was arrested for a traffic offense a short time after he drove away from Padilla's house.

Appellant also admitted that following his mother's trial testimony, he had a conversation with her in which he told her that her testimony was not what he had told her to say. Appellant then admitted that he had written a letter to his mother in which he told her what to say. Appellant also testified that he sent the same letter to his aunt.

During the remainder of the State's cross-examination, appellant claimed that the burglary allegations were part of a conspiracy to keep anyone from learning that Padilla had allegedly given appellant a sexually transmitted disease. Appellant admitted that the majority of text messages and telephone calls during the time period around the burglaries were from him to Padilla and not the opposite. Finally, while he initially denied he received a telephone call from the Pearland Police Department and said the police officer was lying when he testified to that effect, when confronted with his telephone records,

appellant admitted he had received a telephone call from the Pearland Police on October 3, 2010.

After appellant rested, the State presented several rebuttal witnesses. Padilla testified that she is tested for sexually transmitted diseases as part of her regular gynecologist examinations. Padilla also testified that appellant told her that he was dating other people at this time. Padilla was also asked about the October 10, 2010 burglary incident. Padilla testified that while she was working, she received a call from her daughter, who was scared and panicked. After she got off work, Padilla returned home and observed that her back door had been kicked in and the power was cut off at the breaker.

Padilla's daughter, Alicia Hernandez then testified. Hernandez testified that at about 1:00 a.m. on October 10, 2010, she was watching television with her boyfriend when they heard a bang. According to Hernandez, the lights then went out and it sounded like someone was trying to come into the house through the back door. Hernandez heard someone opening drawers in the kitchen and at that point she called the police. Hernandez testified that the intruder left after about five to ten minutes, just before the police arrived.

Officer McGuire was brought back to testify about appellant's arrest on October 10, 2010. According to McGuire, he responded to a call about a possible break-in at Padilla's house. As he arrived at Padilla's house, he heard the backyard fence shake. The police were unable to locate anyone inside the house or backyard. McGuire did observe that the breaker box to Padilla's house was in the backyard. While investigating the break-in, McGuire noticed a truck parked behind Padilla's house and he determined the truck belonged to appellant. The truck was empty but the engine was still hot, so the police set up to observe the truck. After several hours, appellant returned to his truck and he drove off. Another officer stopped appellant for a traffic offense and he was placed under arrest at that time.

10

At the close of the evidence, appellant presented his final argument. During his closing argument, appellant emphasized his various defensive theories. First among these was appellant's contention that the burglary accusations were part of a conspiracy to make him look bad and deflect attention away from the issue of sexually transmitted disease. Appellant also emphasized his contention that the police investigation was inadequate and the existence of appellant's alibis. During his closing argument, appellant questioned whether any burglaries actually occurred; if they did occur what evidence connected them to appellant, and for what possible reason someone would break into a home and take the items reported missing. Finally, appellant directly addressed the issue of the identity of the perpetrator during his closing argument when his defense counsel stated "[w]e don't know who went into that house."

Following the arguments of both sides, the case was submitted to the jury. The jury acquitted appellant of the first burglary charge but found him guilty of the second. At the conclusion of the punishment phase, the jury assessed appellant's punishment at fifteen years' imprisonment. This appeal followed.

## DISCUSSION

### I.      Admission of Extraneous Offenses

In his first issue on appeal, appellant contends the trial court violated Rule 404(b) of the Texas Rules of Evidence when it admitted into evidence testimony regarding the October 10, 2010 burglary allegation. In his second issue, appellant asserts the trial court violated Rule 403 of the Texas Rules of Evidence when it admitted the evidence regarding the October 10, 2010 burglary because the probative value of that evidence was substantially outweighed by the danger of unfair prejudice. Because the two issues grow out of the admission of the same evidence, we address them together.

11

### A. Standard of Review and Applicable Law

Evidence of extraneous offenses is not admissible at the guilt phase of a trial to prove that a defendant committed the charged offense in conformity with a bad character. *Devoe v. State*, 354 S.W.3d 457, 469 (Tex. Crim. App. 2011) (citing Tex. R. Evid. 404(b)). Despite the general rule, extraneous offense evidence may be admissible when it has relevance apart from character conformity. *Id.* Evidence is "relevant to a material issue if the purpose for which the party seeks to have it submitted tends to make 'the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.'" *Smith v. State*, 5 S.W.3d 673, 679 n.13 (Tex. Crim. App. 1999) (quoting *Rankin v. State*, 974 S.W.2d 707, 719–20 (Tex. Crim. App. 1998)). Extraneous offense evidence may be admissible to show motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. *Devoe*, 354 S.W.3d at 469. It is also well settled that extraneous offense evidence is admissible to rebut a defensive theory. *Hudson v. State*, 112 S.W.3d 794, 801 (Tex. App.—Houston [14th Dist.] 2003, pet. ref'd). When a defendant raises a defensive theory, he opens the door for the State to offer rebuttal testimony concerning an extraneous offense if the extraneous offense has characteristics common with the offense for which the defendant is being tried. *Id.*

Extraneous offense evidence that has relevance apart from character conformity may nonetheless be inadmissible under Rule 403 if the trial court determines that the probative value of the evidence is substantially outweighed by the danger of unfair prejudice. Tex. R. Evid. 403. Rule 403 favors the admission of relevant evidence and carries a presumption that relevant evidence will be more probative than prejudicial. *Andrade v. State*, 246 S.W.3d 217, 227 (Tex. App.—Houston [14th Dist.] 2007, pet. ref'd). When conducting a Rule 403 balancing test, a trial court should analyze (1) the inherent probative value of the evidence, or in other words, how compellingly the extraneous offense evidence serves to make a fact of consequence more or less probable, a factor

12

related to the strength of the evidence presented by the proponent to show the defendant committed the extraneous offense; (2) the potential for the evidence to impress the jury in some irrational but nevertheless indelible way; (3) the time the proponent will need to develop the evidence; and (4) the proponent's need for that evidence, i.e., whether other evidence is available and whether the fact of consequence is related to a disputed issue. *Isenhower v. State*, 261 S.W.3d 168, 177–78 (Tex. App.—Houston [14th Dist.] 2008, no pet.); *Prince v. State*, 192 S.W.3d 49, 56 (Tex. App.—Houston [14th Dist.] 2006, pet. ref'd); *Hudson*, 112 S.W.3d at 804.

Because the trial court is in the best position to decide these admissibility questions, an appellate court must review a trial court's evidentiary rulings under an abuse of discretion standard. *Robbins v. State*, 88 S.W.3d 256, 259–60 (Tex. Crim. App. 2002) (citing *Montgomery v. State*, 810 S.W.2d 372, 391 (Tex. Crim. App. 1990) (op. on reh'g)). We uphold a trial court's decision to admit evidence when that decision is within the zone of reasonable disagreement. *Id.* at 260. A trial court is given wide latitude to admit or exclude evidence of extraneous offenses. *Hudson*, 112 S.W.3d at 801. If the trial court's evidentiary ruling is correct on any theory of law applicable to that ruling, it will not be disturbed, even if the trial judge gave the wrong reason for the correct ruling. *Devoe*, 354 S.W.3d at 469. An appellate court misapplies this standard of review if it reverses a trial court's evidentiary ruling simply because the appellate court disagrees with it. *Robbins*, 88 S.W.3d at 260.

### B.    Rule 404(b) Analysis

As discussed above, appellant asserted numerous defensive theories. Among these was his contention that Padilla's two burglary allegations were false charges that were part of a conspiracy against appellant to prevent him from revealing his belief Padilla had given him a sexually transmitted disease. To buttress his false charges allegation, appellant emphasized his belief that the police investigation into the allegations was inadequate in numerous ways, including the failure to execute a search warrant as well as the failure to

13

even ask to see the pictures on the memory disk from Padilla's camera. Appellant also emphasized the lack of any eyewitness testimony placing him inside Padilla's house at the time of the charged offenses as well as his lack of opportunity to commit the offenses because of his car problems and his attendance at his grandfather's birthday celebration in the Woodlands. In essence, appellant challenged whether the two charged burglary incidents occurred at all; and if they did, his identity as the burglar.[2]

The extraneous offense evidence showed that Padilla's daughter was home in the early morning hours of October 10, 2010. She and her boyfriend heard a loud bang as someone kicked in the back door, and they also observed that the electricity went out and heard someone moving about in the kitchen of the house. At that point, they called the police. The police arrived and heard a noise like someone was climbing over the backyard fence. While investigating the report, the police found appellant's empty truck parked behind Padilla's house with the engine still hot. The police kept the truck under observation and when it drove away, they arrested the driver, appellant, for a traffic violation. Because the extraneous offense evidence established that appellant was arrested in close proximity to Padilla's house following a reported break-in, we hold the trial court was within its discretion to conclude that evidence of the October 10, 2010 burglary had non-character conforming relevance rebutting appellant's defensive theory that the charged burglaries were contrived as part of a conspiracy against him. *See Moses v. State*, 105 S.W.3d 622, 627 (Tex. Crim. App. 2003) (holding that the admission of extraneous offense evidence to rebut defensive theory that charges at issue in appeal were contrived in retaliation for complaints filed by defendant's spouse was within the zone of reasonable disagreement); *see also Robbins*, 88 S.W.3d at 260 (holding that because it was

---

[2] The Court of Criminal Appeals has pointed out that it is not the effectiveness of the defendant's defensive theory that controls whether the door has been opened for the State to then introduce extraneous offense evidence to rebut that theory. *See Page v. State*, 137 S.W.3d 75, 79 (Tex. Crim. App. 2004) ("That the impeachment was not particularly damaging or effective in light of all the evidence presented is not the question. The question is whether impeachment occurred that raised the issue of identity. If so, Rule 404(b) permits the introduction of extraneous offenses that are relevant to identity.")

14

subject to reasonable debate whether the extraneous offense evidence made the defensive theories less probable, the trial court did not abuse its discretion when it admitted the evidence); *see Isenhower*, 261 S.W.3d at 181; (stating that a trial court does not abuse its discretion in admitting extraneous offense evidence to rebut a defensive theory of frame-up or retaliation); *see Keen v. State*, 85 S.W.3d 405, 414 (Tex. App.—Tyler 2002, pet. ref'd) (holding that the trial court could have reasonably decided that the extraneous offense evidence had noncharacter conformity relevance where it rebutted the defendant's defensive theory that he was framed).

### C.    Rule 403 Analysis

We turn now to appellant's Rule 403 complaint.  Appellant first argues that the extraneous offense evidence had great potential to impress the jury in an irrational and indelible way.   In support of this contention, appellant points out that the October 10, 2010 incident occurred at night while the two charged offenses occurred during the day.  Appellant also emphasizes the fact that during the October 10 incident, the intruder turned off the electricity and kicked in the back door.   According to appellant these facts made it likely the evidence would lead the jury astray by making them think the intruder was interested in physically harming or even sexually assaulting someone inside the house.  Appellant also argues the State's need for the evidence was low because the State "had other evidence to prove motive."   In addition, appellant contends the State required a great deal of time to introduce the evidence of the extraneous offense as the State questioned appellant about it as well as called three witnesses during rebuttal to address the extraneous offense.  Appellant continues that, as a result of this, the jury was distracted from the charged offenses.  Appellant concludes by asserting the Rule 403 factors weigh against admission of the evidence and the trial court abused its discretion when it admitted the evidence.[3]   We disagree.

---

[3] In his brief, appellant emphasizes the fact that the trial court did not conduct the Rule 403 balancing analysis on the record.   To the extent appellant contends this was error on the part of the trial

15

Here, the extraneous offense evidence established that appellant was arrested on October 10, 2010 for a traffic violation while driving his truck away from a parking lot behind Padilla's house. The truck had been spotted while the police were investigating a report of a break-in at Padilla's house. The extraneous offense evidence also established that the October 10 break-in occurred within days of the charged offenses. We conclude the probative value of the extraneous offense evidence was high as it arguably rebutted appellant's defensive theory that the burglary charges were fabricated as part of a conspiracy against appellant. S*ee Isenhower*, 261 S.W.3d at 181. This factor weighs in favor of admission of the evidence.

Turning to the second factor, the potential of the extraneous offense evidence to impress the jury in an irrational but nonetheless indelible way was low. Despite appellant's argument to the contrary, the evidence was not inflammatory and did not involve a crime of physical violence. In addition, the danger an impermissible inference was created by the admission of the extraneous offense evidence was minimized because the trial court gave a limiting instruction before the evidence was admitted as well as in the jury charge. *See Prince*, 192 S.W.3d at 56 (stating that "any impermissible inference of character conformity can be minimized through a limiting instruction."). We also conclude the second factor weighs in favor of the admission of the evidence.

The third factor in the Rule 403 analysis is the time needed to develop the extraneous offense evidence. Here, the October 10 break-in was not mentioned until the State cross-examined appellant. Then, during the State's rebuttal case, the State called three witnesses to testify about the October 10 break-in. This testimony, including

---

court, we disagree. There is no requirement that the trial court place the results of the Rule 403 balancing test on the record. *Rojas v. State*, 986 S.W.2d 241, 250 (Tex. Crim. App. 1998); *Williams v. State*, 958 S.W.2d 186, 195 (Tex. Crim. App. 1997). Instead, we presume the trial court conducted the balancing test once a party objects on Rule 403 grounds and the trial court rules on the objection, unless the record indicates otherwise. *See Rojas*, 986 S.W.2d at 250 (no error when the trial court listened to defendant's Rule 403objections and then overruled them); *Santellan v. State*, 939 S.W.2d 642, 651 (Tex. Crim. App. 1997).

cross-examination, covers fifty pages out of the 400-plus pages of testimony included in the reporter's record; approximately 12.5%.[4] We conclude this is not excessive. *See Lane v. State*, 933 S.W.2d 504, 520 (Tex. Crim. App. 1996) (holding that extraneous offense evidence totaling twenty percent of the State's case-in-chief was not excessive). The third factor also weighs in favor of admission of the evidence.

With regard to the fourth factor, we conclude the State's need for the evidence was high as it needed the extraneous offense evidence to rebut appellant's defensive theories, particularly his conspiracy defense. *See Isenhower*, 261 S.W.3d at 182 ("Because appellant strongly contested A.B.'s allegations on a theory of retaliation, the State demonstrated its need to counter appellant's defensive theory with Davidson's testimony."). The fourth factor also weighs in favor of admission of the extraneous offense evidence.

Because all of the Rule 403 factors weigh in favor of admission of the evidence, the decision to admit the evidence was within the zone of reasonable disagreement and therefore the trial court did not abuse its discretion when it admitted the extraneous offense evidence. *See id.* We overrule appellant's first and second issues.

## II.     Denial of Appellant's Motion for Mistrial

Following appellant's cross-examination of Detective Journagin which largely challenged the thoroughness of his investigation, the State asked him if there was anything additional he would have liked to do as part of his investigation. In his answer, Detective Journagin arguably commented on appellant's unwillingness to speak to him. Appellant lodged an objection to that testimony as a violation of appellant's Fifth Amendment rights, which the trial court sustained. The trial court also instructed the jury to disregard the

---

[4] While the rebuttal portion of the record runs fifty pages in length, seven of those pages were devoted to discussions outside the presence of the jury addressing the admissibility of an apology letter written by appellant.

17

testimony. Appellant then moved for a mistrial, which the trial court denied. In his third issue, appellant contends the trial court erred when it denied his motion for mistrial.

## A.    Standard of Review and Applicable Law

A trial court's denial of a motion for mistrial is reviewed for an abuse of discretion. *Hawkins v. State*, 135 S.W.3d 72, 77 (Tex. Crim. App. 2004); *Wood v. State*, 18 S.W.3d 642, 648 (Tex. Crim. App. 2000). A mistrial is appropriate only for "highly prejudicial and incurable errors." *Wood*, 18 S.W.3d at 648. A mistrial is a mechanism to end a proceeding when the trial court faces prejudicial error that makes continuance of the trial wasteful and futile. *Id.* When, as here, an appellant is not contesting the trial court's ruling on his objection, but rather the denial of a new trial, the denial should be upheld unless it falls outside the zone of reasonable disagreement. *Archie v. State*, 221 S.W.3d 695, 699 (Tex. Crim. App. 2007); *see Ladd v. State*, 3 S.W.3d 547, 567 (Tex. Crim. App. 1999) (reviewing denial of a mistrial for abuse of discretion when improper question is asked and objection is sustained and instruction is given to jury to disregard). When the trial court has instructed the jury to disregard evidence, the jury is presumed to have followed the instruction. *See Hawkins*, 135 S.W.3d at 77. In determining whether a new trial nonetheless is mandated despite the instruction to disregard, we look at the facts and circumstances of the case to see if the trial court's instruction cured the presentation of objectionable matters before the jury. *See id.*

In *Waldo v. State*, the Court of Criminal Appeals considered, without adopting, six factors to determine whether the curative instruction given by the trial court following an allusion to the defendant's post-arrest silence was effective: (1) the nature of the error, (2) the persistence of the prosecution in committing the error, (3) the flagrancy of the violation, (4) the particular instruction given, (5) the weight of incriminating evidence, and (6) the harm to the accused as measured by the severity of the sentence. *Waldo v. State*, 746 S.W.2d 750, 754 (Tex. Crim. App. 1988). Assuming without deciding (1) that appellant's Fifth Amendment rights had attached by the time Detective Journagin

attempted to speak with him; and (2) that the *Waldo* factors apply, we conclude balancing these factors does not mandate a new trial.

With regard to the first three factors, we conclude the error was inadvertent and not solicited by the State. The offending testimony came as part of Detective Journagin's answer to the prosecutor's question responding to appellant's defense that the police investigation was inadequate and the error was not mentioned again. As for the fourth factor, appellant's attorney promptly objected, the trial court sustained the objection, and then, in response to appellant's request for an instruction to disregard, the trial court instructed the jury to disregard Detective Journagin's testimony. Turning to the fifth factor, we begin by noting that the State's case against appellant was based on circumstantial evidence. Despite that, we do not believe Detective Journagin's inadvertent comment on appellant not wanting to speak to him during the investigation was "so detrimental to his defensive posture as to suggest the impossibility of removing it from the jurors' minds." *Id.* at 757. Finally, the sixth factor also does not weigh in favor of appellant. Appellant was acquitted of one charge and was eventually sentenced to serve fifteen years out of a possible maximum sentence of twenty years' imprisonment. We conclude the results of the trial demonstrate that appellant was not harmed by Detective Journagin's indirect comment on appellant's decision not to talk to him during the police investigation. We overrule appellant's third issue.[5]

---

[5] Appellant's citation of *Wyborny v. State*, 209 S.W.3d 285, 287 (Tex. App.—Houston [1st Dist.] 2006, pet. ref'd) does not change this result. In *Wyborny*, the appellate court reversed the defendant's conviction and remanded for a new trial because it held the trial court erred when it overruled the defendant's objection lodged when the prosecutor directly commented on the defendant's post-arrest silence. *Id.* Because that is not the situation we are presented with here, we conclude the facts are distinguishable and *Wyborny* is not on point.

## CONCLUSION

Having overruled appellant's issues on appeal, we affirm the trial court's judgment.


/s/      Margaret Garner Mirabal
            Senior Justice


Panel consists of Justices Frost, McCally, and Mirabal.[6]

Do Not Publish — TEX. R. APP. P. 47.2(b).

---

[6] Senior Justice Margaret Garner Mirabal sitting by assignment.