**AFFIRMED; Opinion Filed February 2, 2015.**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

### No. 05-13-01489-CR

### WILLIAM PAUL LANGRUM, Appellant
### V.
### THE STATE OF TEXAS, Appellee

**On Appeal from the Criminal District Court No. 5**
**Dallas County, Texas**
**Trial Court Cause No. F11-60330-L**

## OPINION

Before Justices Bridges, Lang-Miers, and Myers
Opinion by Justice Myers

Appellant William Paul Langrum was convicted of capital murder and sentenced to life imprisonment without the possibility of parole. In two issues, he argues (1) the evidence is insufficient to support the conviction; (2) the trial court erred by overruling appellant's objection to the use of evidence of an aggravated robbery allegedly committed by appellant approximately 45 minutes after the instant offense. We affirm.

### BACKGROUND

Sophia Dorian lived at a condominium complex located at the 9800 block of Royal Lane, in Dallas, Texas. The complex's designated parking area was on the street directly in front of the upstairs unit where Dorian lived, and decedent Shearl Bennett's assigned parking space was next to Dorian's. On the night of September 21, 2011, Dorian was in her condo with a guest when she heard what "sounded like squabbling" outside. Dorian testified that this squabbling "kind of

grew louder." She ran to her front door and heard Bennett say, "Oh, my God. Somebody help me. Somebody please help me." Dorian "ripped the door open" and "flew down the steps," where she saw the headlights of a car. At first, she thought "somebody had just had a squabble with their boyfriend or something." Dorian started to retreat, but the car continued to slowly roll forward until she saw Bennett bent over in the open driver's side window of the car. The car drove off, and then Bennett sat down in the grass. Dorian asked Bennett if she was okay. Bennett looked up, closed her eyes, and "just kind of rolled over on her side." Dorian soon noticed her hand was moist from touching Bennett. After realizing Bennett was injured, Dorian looked up at her friend and said, "She's bleeding. She's bleeding."

The vehicle had to turn around to get out of the complex, so it came back towards Dorian and passed in front of her. Dorian told her friend to call 911, and she flagged down the police officers when they arrived. Dorian testified that it was 10:25 p.m. when she and her friend called 911. Dorian described the car she saw as "a metallicy [sic] blue four-door kind of smaller boxy car." She could not see an individual in the car but caught a glimpse of what looked like "a patch of a white shirt" in the driver's seat.

Bennett died at the scene from multiple stab wounds. Her brother, Richard Sapp, testified that she was fifty years old at the time of her death. Some keys, a Bible, and miscellaneous papers were found near the body. Bennett was still wearing her wristwatch and earrings.

The medical examiner, Dr. Nathaniel Patterson of the Southwestern Institute of Forensic Sciences (SWIFS), testified that Bennett suffered stab wounds to the chest, the left side of the upper chest (by the collarbone), and the upper abdomen. The wounds near Bennett's collarbone and to her abdomen were consistent with stab wounds from a single-edged blade. The stab wound to her chest, which was fatal, went into the right atrium of Bennett's heart and through

the right pulmonary vein and into the right middle lobe of her lung, and this caused approximately 740 milliliters of blood to leak into Bennett's chest cavity. Dr. Patterson found no defensive wounds to Bennett's arms or hands.

Nicole Green, who lived next door to Bennett at the condominium complex, testified that on September 21, 2011, she was in bed when she heard a woman hollering for help. She looked out her window and saw a small, older-model four-door Honda Accord[1] drive by. Green knew the car was an Accord because she used "to drive a car like that back in the day." She could not see the driver's face but noticed he was black and wore a white t-shirt. Green ran outside and saw Bennett laying on the ground. A black satchel bag, various cards, Bennett's wallet, and other personal belongings were "kind of all just scattered on the ground," so Green gathered them up and put them in the satchel, which Green believed may have been Bennett's purse. Green stayed with Bennett until the police arrived.

Dallas Police Officer King Seng was the first officer to arrive at the crime scene. He talked to some witnesses and obtained a possible description of the suspect vehicle, which he broadcasted over his police radio. Later that evening, at around 11:10 or 11:13 p.m., Dallas police officer Russell Barrett was at 2800 Douglas, near Lemmon Avenue, in an undercover capacity when he witnessed appellant and another individual, Jeremy Francis, involved in an altercation with a third man, Charles Starks. Appellant was the taller individual and wore a white t-shirt; Francis was shorter and wore a blue t-shirt. The undercover officer saw appellant holding a "large-styled hunting knife" in his hand, and he appeared to be trying to take a bag from Starks. Appellant swung the knife at Starks, causing him to fall backwards. Appellant took the bag, after which he and Francis fled on foot, got into a vehicle in a nearby parking lot, and

---

[1] Green did not know the vehicle's color. She testified: "It was like a little four-door Honda Accord, an older model. It could have been black, could have been blue, it could have been green. I don't know. I couldn't tell."

quickly drove away. Officer Barrett called for assistance from uniformed police officers.

A squad car got behind the suspect vehicle and followed it as it headed north on Maple. Officer Barrett saw the squad car turn on its lights and sirens and attempt to pull the vehicle over, but appellant, who was driving, "started evading them at an even higher speed." Police pursued the car for a few miles until it stopped at Fairmount and Claire. Appellant and Francis got out of the car and fled on foot, were chased by police, and then got back in the car and drove away. By this point, Officer Barrett caught up with the pursuing squad cars, and he and another undercover officer joined the chase. Officer Barrett heard over the police radio that a robbery had occurred at 2800 Douglas; he responded that he had seen the robbery.

The officers followed the suspect vehicle for approximately five miles to the 7100 block of Lemmon Avenue, where it was disabled after hitting a curb. Appellant and Francis got out of the car and fled in opposite directions. Officer Barrett pursued appellant, who was still carrying the large knife. Officer Barrett yelled at appellant, "Stop. Police. Drop the knife." Appellant fled in a northeastern direction on Lemmon until he reached the edge of a car dealership, where he dropped the knife and continued running. Officer Barrett pursued appellant until he stopped him at gunpoint at the dealership. Appellant was handcuffed and taken into custody. Officer Barrett retrieved the knife appellant threw away, which was admitted at trial.

Officer Richard Stewart testified that on September 21, 2011, he received a call from Officer Barrett regarding a possible aggravated robbery. When he reached the location of the suspected aggravated robbery Officer Stewart saw a green Honda, which he followed as it drove away. Officer Stewart activated his overhead lights and attempted to initiate a traffic stop, but the vehicle did not stop. It eventually pulled over to the side of the road, and both the driver and passenger got out and fled on foot. Officer Stewart chased the driver, who wore a white t-shirt. When the driver attempted to jump a chain link fence, Officer Stewart grabbed him, pulled him

–4–

off the fence, and they fell to the ground. The driver got up and ran back towards the car, and drove off. As he drove away, the driver picked up the passenger. Officer Stewart pursued the vehicle for about five miles until it became disabled after hitting a curb on Lemmon Avenue. The driver got out of the car holding a knife above his head, and Officers Stewart and Barrett chased the driver on foot. They cornered and arrested him at a car dealership following a brief struggle.

The car appellant was driving, a 1995 Honda Accord, had been reported stolen earlier that day by Kimberly Thomas, appellant's former girlfriend. She testified that she and appellant dated from about 2009 to 2011. Appellant drove the car while they were dating, and when they broke up in early September 2011, appellant left in Thomas's car. The car had been missing for about three weeks when Thomas reported it stolen. Approximately eight to twelve hours after she reported it stolen, Thomas received a telephone call that the car had been found. Thomas testified that she spoke to Dallas Police detective Dale Lundberg, the lead detective in the investigation, in September 2011, but did not recall telling him that appellant told her he could not find a job, so he was going to start robbing people.

During the search of the Honda Accord, various items were seized, including a purse and a gym bag. A towel was found inside the purse. A camera, a notebook, screwdriver, pager, and "doo-rag" were also found in the purse. Mail addressed to appellant was found in the trunk of the car. A picture of appellant on the camera led Detective Lundberg to believe the bag did not belong to Shearl Bennett. Lundberg also testified that the purse did not match descriptions he was given by people who knew Bennett as a type of purse she would have carried. The gym bag was returned to the victim of the robbery.

The State also presented forensic evidence. Alexander Nham, a forensic biologist with the SWIFS, confirmed the presence of blood on the knife and towel, as well as on appellant's t-

shirt, underwear, and shorts.  Ken Balagot, a forensic biologist with SWIFS, and a DNA analyst, testified that the DNA from the knife came from a single female and matched the DNA profile of Shearl Bennett at a random match probability of one in 573 billion.  The stain from the towel included the DNA profiles of both Bennett and appellant, with a random match probability to Bennett of one in 573 billion, and a random match probability to appellant of 1 in 4.55 trillion. The DNA from the white t-shirt matched appellant's DNA profile, with a random match probability to appellant of 1 in 4.55 trillion, and lower level genetic markers matched the DNA profiles of Bennett (random match probability of 63 in 100) and Francis (random match probability of 1 in 4).

The defense rested without calling any witnesses.  The jury ultimately found appellant guilty of capital murder as charged in the indictment.  Appellant was sentenced to life in prison without the possibility of parole.

## DISCUSSION

### 1. Sufficiency of the Evidence

In his first issue, appellant argues the evidence is insufficient to support the conviction. Appellant was charged with capital murder, which required the State to prove appellant intentionally caused Bennett's death in the course of committing or attempting to commit robbery.  *See* TEX. PENAL CODE ANN. § 19.03(a)(2).  The indictment alleged that on or about September 21, 2011, appellant did:

> unlawfully then and there intentionally cause the death of SHEARL BENNETT, an individual, hereinafter called deceased, by STABBING AND BY CUTTING THE DECEASED WITH A KNIFE, A DEADLY WEAPON, and the defendant was then and there in the course of committing and attempting to commit the offense of ROBBERY of said deceased.

We review appellant's sufficiency challenge by considering all the evidence in the light most favorable to the verdict; based on that evidence and any reasonable inferences, we must

determine whether a rational fact finder could have found the essential elements of the offense beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *Thornton v. State*, 425 S.W.3d 289, 303 (Tex. Crim. App. 2014). Under this standard, the fact finder has full responsibility for resolving conflicts in the testimony, weighing the evidence, and drawing reasonable inferences from basic facts to ultimate facts. *Jackson*, 443 U.S. at 319. We presume that the fact finder resolved any conflicts in the evidence in favor of the verdict and defer to that determination. *See id*. at 326. We do not reassess witness credibility. *Thornton*, 425 S.W.3d at 303.

Appellant makes several arguments as to why the evidence in this case is insufficient. He contends no one saw him using the knife to stab Shearl Bennett. He argues that, if he stabbed Bennett, "there should have been a vast amount of blood in the vehicle," on appellant, and on his clothing. He also contends there is no evidence anything was stolen or that there was any attempt to commit a robbery, and that Bennett was still wearing her wristwatch, earrings, had her car keys, and her cellphone was found at the crime scene.

None of these arguments are persuasive. To begin with, although no one actually saw appellant stab Bennett, the evidence suggests she was stabbed before she moved away from the Honda vehicle and collapsed on the ground. Less than an hour later, appellant was seen driving a green Honda, and he was apprehended possessing a knife that was later determined to have traces of Bennett's blood on it. Appellant wore a white t-shirt the night he was apprehended, and two witnesses provided testimony that indicated the individual they saw driving the vehicle wore a white shirt. DNA from appellant's t-shirt matched the DNA profiles of both appellant and Bennett. Blood from the towel found in the car appellant was driving also matched the DNA profiles of appellant and Bennett. As for appellant's argument that there should have been a "vast amount of blood" in the car and on him, the medical examiner explained that because the

fatal stab wound was to Bennett's heart, a significant amount of blood pooled inside of her chest cavity. He stated that blood "certainly could be extruded from the wound, but it doesn't necessarily have to be."

Furthermore, the State was not required to prove a completed theft in order to prove appellant committed capital murder. He was charged by indictment with causing the death of Shearl Bennett while "in the course of committing and *attempting to commit* [emphasis added] the offense of robbery." Section 19.03(a)(2) of the Texas Penal Code provides that a person commits capital murder if he "commits murder as defined under Section 19.02(b)(1) and . . . intentionally commits the murder in the course of committing or *attempting to commit . . .* robbery." *See* TEX. PENAL CODE ANN. § 19.03(a)(2) (emphasis added). "The State did not bear the burden of proving that the appellant completed the theft of the victim in order to establish the underlying offense of robbery or attempted robbery." *Young v. State*, 283 S.W.3d 854, 862 (Tex. Crim. App. 2009). "Rather, the requisite intent to rob may be inferred from circumstantial evidence, particularly the appellant's assaultive conduct." *Id*.

In this case, the fact that various items belonging to Bennett, including her cell phone, wallet, keys, and miscellaneous cards and papers, were found scattered on the ground near her body is circumstantial evidence that appellant attempted to rob Bennett. In addition, the jury was free to determine that appellant's former girlfriend, Thomas, was not being truthful when she did not recall telling Detective Lundberg that appellant said he was going to start robbing people because he could not find a job. This statement, attributed to appellant, is further evidence of his intent to rob Bennett. Given the combined and cumulative force of all the evidence, direct and circumstantial, there is ample evidence from which a jury could reasonably conclude appellant intentionally committed murder in the course of committing or attempting to commit robbery. Thus, the evidence is sufficient to support the jury's verdict. We overrule appellant's first issue.

–8–

## 2. *Extraneous Offense Evidence*

In his second issue, appellant argues the trial court erred by overruling appellant's pretrial objection to the use of any evidence of the aggravated robbery alleged to have been committed by appellant approximately 45 minutes after the instant offense.

Prior to trial, appellant filed a motion in limine that asked for a hearing regarding the aggravated robbery offense witnessed by Officer Barrett to determine "[w]hether the aggravated robbery occurred at a time sufficiently recent to have some bearing on the credibility of any witness," "[w]hether the prejudicial effect of the extraneous aggravated robbery will outweigh the alleged probative relevance of said matter," and "[w]hether the identity of the Defendant is at issue." At the pretrial motion in limine hearing, the State responded in part:

> Judge, I think the law is clear that the jury be allowed to have the viewpoint of this offense in its entirety in this case. The aggravated robbery occurs less than an hour after the alleged murder occurs. The murder weapon is seen in the defendant's hand during the commission of the aggravated robbery. The chase that occurs as a reason of that aggravated robbery—which is both a car chase and a foot chase by the Dallas Police Department—occurs only because of the viewed aggravated robbery. The finding of the knife is part of that aggravated robbery and that chase is how they find the knife and see the defendant throw the knife. And I think that to not be able to get into the aggravated robbery and its secondary chase puts a false implication in front of the jury, or false front in front of the jury of the facts of the offense how evidence was collected, how the defendant was found, how his car was found and all his actions. And I think case law is clear that although it is technically an extraneous offense due to the proximity and time from that offense until the time of the murder offense, that it would be relevant rather than try to hide things from the jury.

The trial court ruled that Officer Barrett could testify regarding the aggravated robbery, albeit for a limited purpose. But the victim of the aggravated robbery, Starks, could not testify:

> The Court has ruled that the officer can testify as to all of his probable cause to initiate the chase that led to the recovery of the victim and the alleged murder weapon to the defendant and the alleged murder weapon to the testimony of the complaining witness in the aggravated robbery case. It would, in the Court's opinion, just be cumulative and is not required. The Court wants the case tried, the murder case tried, and not the aggravated robbery case tried as much as

possible. So the officer can testify to everything that he saw and everything that he did; however, the testimony of the aggravated robbery victim is not necessary for the State's murder case, therefore, that witness is not necessary.

The following day, just before the start of voir dire, appellant's trial counsel made the following objection:

> Judge, I just would like to put on the record, for purposes of appellate purposes, as well as any other purposes of the court, a specific objection to the Court's ruling yesterday regarding the use of the aggravated robbery information that is to be testified to by Officer Bennett [sic].
>
> And just for clarification for the record, I am calling this Defense's Trial Objection 1. The proposal by the State was that the use of the aggravated robbery fit under the Court's ruling in *Poindexter* and *Rogers* in that the crimes were an individual criminal transaction and full proof by testimony of any one of them cannot be given without showing the others. And we object that there is a possibility of offering full proof without going into the details of the aggravated robbery and, therefore, causing more prejudicial harm to [appellant] in this case than it is probative to the jury. And it violates his due process in having a fair and neutral jury in that they are hearing about two criminal transactions in one. And our intention is to renew Trial Objection 1 prior to Officer Bennett [sic] testifying, but not to go into the details as we've just done.

We review the trial court's decision to admit or exclude evidence under an abuse of discretion standard. *Martinez v. State*, 327 S.W.3d 727, 736 (Tex. Crim. App. 2010). The trial court does not abuse its discretion unless its decision to admit or exclude the evidence lies outside the zone of reasonable disagreement. *See Martinez*, 327 S.W.3d at 736; *De La Paz v. State*, 279 S.W.3d 336, 343–44 (Tex. Crim. App. 2009). We will uphold the trial court's evidentiary ruling if it was correct on any theory of law applicable to the case. *See De La Paz*, 279 S.W.3d at 344.

Only relevant evidence is admissible. *See* TEX. R. EVID. 402. Rule 401 defines relevant evidence as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." TEX. R. EVID. 401. Rule 404(b) provides that evidence of an accused's "other crimes, wrongs or acts is not admissible to prove the character of a person in order to

show action in conformity therewith." TEX. R. EVID. 404(b). Evidence of extraneous acts "may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident[.]" *Id*.

The exceptions listed in rule 404(b) "are neither mutually exclusive nor collectively exhaustive." *De La Paz*, 279 S.W.3d at 343. "The proponent of uncharged misconduct evidence need not 'stuff' a given set of facts into one of the laundry-list exceptions set out in Rule 404(b), but he must be able to explain to the trial court, and to the opponent, the logical and legal rationales that support its admission on a basis other than 'bad character' or propensity purpose." *Id*.

The State argues, in part, that evidence of the aggravated robbery was admissible because it was same transaction contextual evidence. *See Rogers v. State*, 853 S.W.2d 29, 33 (Tex. Crim. App. 1993) (en banc). Evidence of another crime, wrong, or act may be admissible as same transaction contextual evidence when several crimes are intermixed, blended with one another, or connected so that they form an indivisible criminal transaction, and full proof by testimony of any one of them cannot be given without showing the others. *Devoe v. State*, 354 S.W.3d 457, 469 (Tex. Crim. App. 2011). The purpose of admitting extraneous evidence as same transaction contextual evidence is to place the instant offense in context. *Nguyen v. State*, 177 S.W.3d 659, 667 (Tex. App.—Houston [1st Dist.] 2005, pet. ref'd). "[I]t has long been the rule in this State that the jury is entitled to know all the relevant surrounding facts and circumstances of the charged offense; an offense is not tried in a vacuum." *Moreno v. State*, 721 S.W.2d 295, 301 (Tex. Crim. App. 1986). But same transaction contextual evidence is admissible as an exception under rule 404(b) only when the offense would make little or no sense without also bringing in that evidence, and only to the extent it is necessary to the jury's understanding of the offense. *Devoe*, 354 S.W.3d at 469.

In this case, the aggravated robbery witnessed by Officer Barrett occurred less than an hour after the instant offense. An undercover officer saw appellant threatening the aggravated robbery victim with a knife, and the police pursued appellant both in car and on foot. The knife discarded by appellant during the foot pursuit preceding his arrest was found to contain traces of Shearl Bennett's blood. Appellant drove a green Honda and wore a white t-shirt. Two witnesses provided testimony that indicated the individual they saw fleeing the murder scene wore a white shirt, and one of them described the vehicle as a small, older-model four-door Honda Accord. The recovery of the knife and the Honda would have been difficult to explain to a jury without referring to the aggravated robbery that first brought appellant to the police's attention. The jury was entitled to hear these interwoven and highly related facts. Based on this record, the trial court could reasonably conclude appellant's testimony was admissible as same transaction contextual evidence because it was necessary to the jury's understanding of the offense.

Additionally, however, evidence that is admissible under rule 404(b) may nonetheless "be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or needless presentation of cumulative evidence." TEX. R. EVID. 403; *Mozon v. State*, 991 S.W.2d 841, 846–47 (Tex. Crim. App. 1999). A rule 403 analysis involves a balance of: (1) the inherent probative force of the proffered item of evidence along with (2) the proponent's need for that evidence against (3) any tendency of the evidence to suggest decision on an improper basis, (4) any tendency of the evidence to confuse or distract the jury from the main issues, (5) any tendency of the evidence to be given undue weight by a jury that has not been equipped to evaluate the probative force of the evidence, and (6) the likelihood that presentation of the evidence will consume an inordinate amount of time or merely repeat evidence already admitted. *Gigliobianco*

*v. State*, 210 S.W.3d 637, 641–42 (Tex. Crim. App. 2006).[2]  Rule 403 favors admissibility, and "the presumption is that relevant evidence will be more probative than prejudicial." *Montgomery v. State*, 810 S.W.2d 372, 389 (Tex. Crim. App. 1991); *see also De La Paz*, 279 S.W.3d at 343. As with rule 404, a trial court does not abuse its discretion when it admits or excludes evidence pursuant to rule 403 so long as its decision is within the zone of reasonable disagreement. *See De La Paz*, 279 S.W.3d at 343–44.

Regarding the rule 403 factors, the first two factors favor admissibility because the evidence placed the charged offense in context and served to make the fact or consequence that appellant committed the offense more probable by showing when appellant first came to the police's attention and how the knife and Honda vehicle were recovered. The State's need for that evidence was significant because it would have been difficult to explain to a jury how the knife and Honda were recovered without referring to the aggravated robbery that occurred less than an hour after the instant offense. As for the third factor, evidence that appellant committed the aggravated robbery offense was not so inherently inflammatory that it should have influenced the jury in some "irrational but indelible way." *See Wheeler v. State*, 67 S.W.3d 879, 889 (Tex. Crim. App. 2002).  The fourth and sixth factors concern the tendency of the evidence to confuse or distract the jury from the main issues and the amount of time consumed by the presentation of the extraneous offense evidence. *See Gigliobianco*, 210 S.W.3d at 641. These factors likewise favor admissibility because evidence regarding the aggravated robbery did not take a significant amount of time at trial. Of nineteen witnesses called by the State, only Officer Barrett testified regarding the aggravated robbery, which he witnessed, and the aggravated robbery itself was a

---

[2] The *Gigliobianco* court noted that this newly-worded framework merely refined and built upon its previous analysis, and brought it into line with the plain text of rule 403. *See Gigliobianco*, 210 S.W.3d at 642 n.8 ("In some of our precedents, we stated that a proper Rule 403 analysis included, but was not limited to, four factors: (1) the probative value of the evidence, (2) the potential of the evidence to impress the jury in some irrational yet indelible way, (3) the time needed to develop the evidence, and (4) the proponent's need for the evidence. By our decision today, we do no more than refine and build upon our previous analysis, and bring it in line with the plain text of Rule 403.") (citation omitted).

small part of the State's evidence. The State presented evidence of the car and foot chases that immediately followed the aggravated robbery, but these pursuits resulted in the apprehension of appellant, the recovery of the knife, and the Honda vehicle. The fifth factor concerns "a tendency of an item of evidence to be given undue weight by the jury on other than emotional grounds. For example, 'scientific' evidence might mislead a jury that is not properly equipped to judge the probative force of the evidence." *Id.* (citation omitted). Testimony relating to the aggravated robbery was not prone to such a tendency, as it concerned matters easily understandable by a jury. Thus, the fifth factor also weighs in favor of admission. For all of these reasons, then, we conclude that the probative value of the evidence regarding the aggravated robbery was not substantially outweighed by the danger of unfair prejudice or any other rule 403 concerns. *See* TEX. R. EVID. 403; *Gigliobianco*, 210 S.W.3d at 641–42. We overrule appellant's second issue.

The trial court's judgment is affirmed.

/ Lana Myers/
LANA MYERS
JUSTICE

Do Not Publish
TEX. R. APP. P. 47
131489F.U05



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

WILLIAM PAUL LANGRUM, Appellant

No. 05-13-01489-CR     V.

THE STATE OF TEXAS, Appellee

On Appeal from the Criminal District Court No. 5, Dallas County, Texas
Trial Court Cause No. F11-60330-L.
Opinion delivered by Justice Myers. Justices Bridges and Lang-Miers participating.

Based on the Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

Judgment entered this 2nd day of February, 2015.