

# IN THE
# TENTH COURT OF APPEALS

## No. 10-16-00336-CR

**DAVID WAYNE ZAHIRNIAK,**

**Appellant**

**v.**

**THE STATE OF TEXAS,**

**Appellee**

**From the 54th District Court**
**McLennan County, Texas**
**Trial Court No. 2014-1127-C2**

## MEMORANDUM OPINION

Appellant David Wayne Zahirniak[1] was found guilty by a jury of the murder of

Caitlyn Reed.[2] The jury imposed a sentence of life in prison and a $10,000 fine. Appellant

challenges his conviction in five issues. We will affirm.

---

[1] Because numerous witnesses share the same surnames, we will refer to Appellant as "Appellant" and to other private individuals by their first names after initial identification.

[2] Caitlyn was still married to Zachary Goates ("Zach") at the time of her death, but they were in the process of divorcing. The indictment identifies her as "Caitlyn Reed" not "Caitlyn Goates."

*Background*

Caitlyn, also known as "Katy," died from a close contact gunshot wound to the chest on April 5, 2014. Appellant, who was in an on-again/off-again relationship with Caitlyn, was present when she died. Appellant told responding deputies that Caitlyn committed suicide. Appellant was the only other person at Caitlyn's house when she died, and Appellant denied that a third-party was responsible for her death. Appellant also made no claim that the shooting was the result of an accident or self-defense. The only two scenarios presented to the jury were that Caitlyn shot herself or that Appellant shot her.

Caitlyn's family denied that she was suicidal, insisting that she loved her children too much to commit such an act. Caitlyn was also planning and looking forward to her child's birthday party the upcoming week-end. Although Caitlyn was prescribed anti-depressants, her grandmother saw that as a positive sign that Caitlyn was doing something to fight her depression and not an indication that Caitlyn was suicidal. Teri Goodwin, who was in a relationship with Appellant's second cousin, Wesley Zahirniak, testified that she had noted that Caitlyn was very depressed. Teri also testified that she had to make Caitlyn throw up on one occasion when she took too many Xanax pills and lost consciousness. Teri did not specifically indicate, however, that she believed Caitlyn was suicidal. Appellant's expert, Edward Hueske, a forensic science consultant with training in shooting reconstructions, testified that his examination of the crime scene

photos led him to the opinion that the gun that killed Caitlyn was in an upside-down position when fired. That fact, and Hueske's analysis of suicide literature, supported his opinion that the scene depicted in the crime scene photos was a suicide. Joseph Scaramucci, a detective with the McLennan County Sheriff's Office, discredited Hueske's testimony through comparison of a cast of the firearm used to kill Caitlyn with the autopsy photos of the wound in her chest that showed that the gun was right-side up when fired.

Appellant had a motive to kill Caitlyn because she refused to drop the aggravated assault charges that she filed against him a couple of weeks prior to her death. Appellant beat Caitlyn with his hands and a cane so severely that she required hospitalization. Appellant was also seen fighting with Caitlyn in her front yard shortly before her death. A neighbor who drove by Caitlyn's house immediately prior to the arrival of law enforcement saw Appellant calmly sitting on the tailgate of his truck in the front yard while waiting for deputies to arrive. Appellant's calm demeanor belied his subsequent fake tears when questioned by deputies from the sheriff's office. Additionally, gunshot residue was found on Appellant's hands and his DNA was discovered on the magazine of the gun used to kill Caitlyn. Appellant also confessed his involvement in Caitlyn's death to two inmates who were incarcerated with him at the McLennan County Jail. Both knew details of Caitlyn's death that could only have come from someone who was present when she was killed.

Several law enforcement officers testified regarding the common behavior exhibited by domestic violence perpetrators. An abuser[3] attempts to control his victim by monitoring her whereabouts, making her financially dependent, and isolating her from friends and family. Abusers may also try to exert that control through threats of consequences other than physical violence. If unchecked, an abuser's violent behavior may escalate, leading to more serious injuries. Abusers who escalate may no longer attempt to conceal their abuse of the victim and may openly mistreat the victim in front of others. Abusers who continue their abuse even in the presence of law enforcement officials are particularly dangerous.

Appellant testified that he paid Caitlyn's rent and bought her a vehicle. There is no indication that Caitlyn had another source of income. Appellant also admitted that he sent text messages to Caitlyn threatening to have her probation revoked, thereby jeopardizing the custody of her children. Although Appellant admitted that there was physical violence, he claimed that it was mutual and much of it initiated by Caitlyn, who was half his age and half his size. Appellant also denied beating Caitlyn with a cane, and he downplayed the severity of her injuries. One incident of abuse occurred in front of Caitlyn's sister a few months prior to Caitlyn's death.

---

[3] Domestic violence perpetrators can be male or female, as can their victims. We use the masculine in this regard because Appellant is male.

On the morning of the aggravated assault, Appellant left Caitlyn's house but then drove by a number of times before deputies and an ambulance arrived. After deputies arrived, Appellant began sending text messages to Caitlyn that her sister read and that deputies photographed. The "vile" texts, as the prosecutor termed them in closing, denigrated Caitlyn and exposed details of their intimate relations. Once the deputies left and Caitlyn was being transported in the ambulance, Appellant returned. Appellant forced the ambulance to halt by stopping his truck in front of it. Appellant only moved his truck after Mike Reed, who was a paramedic with the West volunteer ambulance service and Caitlyn's uncle, stopped behind Appellant's truck and questioned what Appellant was doing. Appellant then drove around the ambulance on the wrong side of the road, through a ditch, almost crashing into the car of Caitlyn's sister who was following the ambulance. Caitlyn realized it was Appellant who was stopping the ambulance and became hysterical, believing that Appellant was going to attack them.

Caitlyn also exhibited behavior common to domestic violence victims, returning to Appellant on several occasions despite the physical and verbal abuse. Caitlyn also did not communicate with her family as often while she remained in a relationship with Appellant. Caitlyn had, however, taken several steps to distance herself from Appellant after the March aggravated assault, including changing her telephone number and the locks on her doors. Caitlyn told others, including a co-worker, that she was afraid of Appellant. The co-worker testified that Caitlyn told her that Appellant threatened to kill

Caitlyn because she had him arrested. Teri testified that Caitlyn also told her that Appellant assaulted her and that she was afraid of him. Teri further testified that Caitlyn showed her a text from Appellant that said he was going to rape and kill Caitlyn, which Appellant confirmed sending in Teri's presence but later deleted from his phone.

Appellant gave numerous versions of events when he was questioned by law enforcement and when he testified at trial. Appellant's recounting of the events that occurred on the day Caitlyn died, and the times they occurred, changed as he was confronted with new information discovered by law enforcement, including the times he saw Caitlyn on the day of her death, the position in which he found her body, and the acts he performed after finding her. Appellant also denied ever seeing or touching the gun that killed Caitlyn until confronted with the DNA evidence. Appellant then "remembered" that he had used the gun when target shooting with Caitlyn's father. Caitlyn's father died prior to trial, and Caitlyn's family denied that Appellant had ever been shooting with her father.

After the investigation began, Appellant hid relevant evidence. Appellant deleted all of the text messages from his cell phone. Appellant also gave Caitlyn's cell phone to his son, Kody Zahirniak, who attempted to sell it to a co-worker. Caitlyn's cell phone was never recovered.

### Issues

Appellant asserts the following:

1) The trial court erred by admitting evidence that Appellant attempted to intercept the ambulance carrying Caitlyn to the hospital after Appellant had beaten her.

2) The trial court erred by admitting text messages that were unfairly prejudicial.

3) The evidence is factually insufficient to prove that Appellant murdered Caitlyn.

4) The trial court erred by assessing court costs against Appellant because he is indigent.

5) The statutes authorizing the assessment of court costs against indigent criminal defendants are unconstitutional as applied to Appellant and violate his right to equal protection because court costs are not assessed against indigent civil parties.

### *Factual Insufficiency*

In his third argument, Appellant argues that the evidence is factually insufficient to prove he murdered Caitlyn. Appellant acknowledges that the court of criminal appeals eliminated appellate review for factual sufficiency, but he nonetheless urges this Court to conduct such a review.[4] *See Brooks v. State*, 323 S.W.3d 893, 895 (Tex. Crim. App. 2010) (plurality op.). The court of criminal appeals has previously rejected opportunities to reinstate factual sufficiency review. *Martinez v. State*, 327 S.W.3d 727, 730 (Tex. Crim. App. 2010) (adopting *Brooks* plurality as a unanimous majority review); *see also Sanders*, 2015 WL 2170229, at *2. As an intermediate appellate court, we are required to follow binding precedent in cases decided by the court of criminal appeals. *State v. DeLay*, 208

---

[4] Appellant makes no claim that the evidence is legally insufficient to support his conviction, thus conceding that the evidence is sufficient under the *Jackson v. Virginia* standard of review. *See, e.g., Sanders v. State*, No. 10-14-00211-CR, 2015 WL 2170229, at *1 (Tex. App.—Waco May 7, 2015, pet. ref'd) (mem. op., not designated for publication) ("By asking this Court to only review the factual sufficiency of the evidence, Sanders concedes the evidence is sufficient under the *Jackson* standard of review.").

S.W.3d 603, 607 (Tex. App.—Austin 2006) ("As an intermediate appellate court, we lack the authority to overrule an opinion of the court of criminal appeals"), *aff'd sub nom., State v. Colyandro*, 233 S.W.3d 870 (Tex. Crim. App. 2007); *see also Calderon v. State*, No. 10-17-00265-CR, 2019 WL 962310, at *3 (Tex. App.—Waco Feb. 27, 2019, no pet.) (mem. op., not designated for publication). This Court has also previously considered and rejected the arguments presented by Appellant. *See Sanders*, 2015 WL 2170229, at *2; *Steggall v. State*, No. 10-17-00017-CR, 2018 WL 3763747, at *1 (Tex. App.—Aug. 8, 2018, pet. ref'd) (mem. op., not designated for publication).[5] We are not persuaded to consider this argument in this proceeding. We overrule issue three.

### *Improperly Admitted Evidence*

In his first and second issues, Appellant asserts that the trial court erred in admitting text messages sent to Caitlyn and Zach by Appellant and evidence relating to the incident with the ambulance carrying Caitlyn to the hospital.

We review a trial judge's decision on the admissibility of evidence for an abuse of discretion. *Tillman v. State*, 354 S.W.3d 425, 435 (Tex. Crim. App. 2011). As long as the trial court's ruling is not outside the "zone of reasonable disagreement," there is no abuse of discretion. *Martinez*, 327 S.W.3d at 736; *see also Newton v. State*, 301 S.W.3d 315, 317 (Tex. App.—Waco 2009, pet. ref'd). An evidentiary ruling will be upheld if it is correct

---

[5] Appellant refers to another case from this Court in which the PDR was pending. *See Garcia v. State*, No. 10-16-00045-CR, 2017 WL 124163 (Tex. App.—Waco Jan. 11, 2017, pet. ref'd) (mem. op., not designated for publication). The PDR was refused in that case after Appellant's brief was filed.

on any theory of law applicable to the case. *Devoe v. State*, 354 S.W.3d 457, 469 (Tex. Crim. App. 2011).

A. The ambulance incident. Appellant argues that the State failed to give specific notice that it was offering evidence of the events related to his interaction with the ambulance taking Caitlyn to the hospital. The State gave notice prior to trial that it intended to introduce the events surrounding Appellant's aggravated assault of Caitlyn, but the State did not specifically give notice that the ambulance incident was included.

Extraneous offenses are not admissible during the guilt phase of a trial in order to prove that a defendant committed the charged offense in conformity with a bad character. TEX. R. EVID. 404(b); *Devoe*, 354 S.W.3d at 469. "However, extraneous offense evidence may be admissible when it has relevance apart from character conformity. For example, it may be admissible to show proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." *Devoe*, 354 S.W.3d at 469 (citation omitted).

Rule 404(b) further provides that the prosecution must provide reasonable notice of the intent to offer extraneous-offense evidence in its case-in-chief upon request by a defendant. An exception under the rule exists when an extraneous act arises in the same transaction. TEX. R. EVID. 404(b)(2) ("On timely request by a defendant in a criminal case, the prosecutor most provide reasonable notice before trial that the prosecution intends to introduce such evidence—*other than that arising in the same transaction*—in its case-in-chief.") (emphasis added).

> Evidence of another crime, wrong, or act also may be admissible as same-transaction contextual evidence where "several crimes are intermixed, or blended with one another, or connected so that they form an indivisible criminal transaction, and full proof by testimony, . . ., of any one of them cannot be given without showing the others." *Wyatt v. State*, 23 S.W.3d 18, 25 (Tex. Crim. App. 2000) (quoting *Rogers v. State*, 853 S.W.2d 29, 33 (Tex. Crim. App. 1993)).

*Devoe*, 354 S.W.3d at 469.

In this case, the ambulance incident was intertwined with, and a continuation of, Appellant's aggravated assault of Caitlyn. After Appellant left Caitlyn's house, he drove by her house more than once and continuously texted threats to her in order to discourage her from reporting the assault. Appellant's attempt to stop the ambulance was another attempt to thwart her reporting of the assault to authorities. The trial court's determination that the ambulance incident was part of the same transaction is not outside the zone of reasonable disagreement. We overrule issue one.

B. Text Messages. Appellant argues that text messages sent to Caitlyn and Zach should have been excluded. Appellant sent texts to Zach that contained the same "vile" messages he sent to Caitlyn. Appellant specifically argues that the trial court abused its discretion because: (1) the State failed to give notice that it intended to offer the texts sent to Zach; (2) the texts sent to Zach were irrelevant; (3) the texts sent to both Caitlyn and Zach were not properly authenticated; and (4) the probative value of the texts sent to Caitlyn and Zach was substantially outweighed by the danger of unfair prejudice.

1. Notice. Appellant argues that the State failed to give sufficient notice of the text messages sent to Zach. As previously noted, Rule 404(b) requires notice of extraneous offenses. "To constitute an extraneous offense, the evidence must show a

crime or bad act, and that the defendant was connected to it." *Moreno v. State*, 858 S.W.2d 453, 463 (Tex. Crim. App. 1993) (en banc) (quoting *Lockhart v. State*, 847 S.W.2d 568, 573 (Tex. Crim. App. 1992)). The text message exchange between Zach and Appellant could be described, as the State notes, as "rude, tasteless or unseemly," but the messages do not rise to the level of crimes or bad acts requiring notice under Rule 404(b).

2. Relevance. Appellant argues that the texts sent to Zach should have been excluded because they were irrelevant. Article 38.36 of the Code of Criminal Procedure provides that in a prosecution for murder, either the state or the defendant is permitted to "offer testimony as to all relevant facts and circumstances surrounding the killing and the previous relationship existing between the accused and the deceased, together with all relevant facts and circumstances going to show the condition of the mind of the accused at the time of the offense." TEX. CODE CRIM. PRO. ANN. art. 38.36(a). The texts revealed what little regard Appellant had for Caitlyn and repeated the threats he had sent to her. The texts could be seen, as Zach testified, as a further attempt by Appellant to damage the relationship between Zach and Caitlyn and to further isolate her from her family and friends. They were, therefore, relevant.

3. Authentication. "Evidence has no relevance if it is not authentically what its proponent claims it to be." *Tienda v. State*, 358 S.W.3d 633, 638 (Tex. Crim. App. 2012). Under Rule 104(a), the decision to admit or exclude evidence is a preliminary question to be decided by the trial court. TEX. R. EVID. 104(a). The trial court is not required to be persuaded that the proffered evidence is authentic. *See id*. "The preliminary question for the trial court to decide is simply whether the proponent of the

evidence has supplied facts that are sufficient to support a reasonable jury determination that the evidence he has proffered is authentic." *Tienda*, 358 S.W.3d at 638.

Rule 901 provides that evidence, such as text messages, may be authenticated or identified if the proponent produces "evidence sufficient to support a finding that the item is what the proponent claims it is." TEX. R. EVID. 901. Personally observing the purported author actually typing and/or sending a message, as Appellant argues, is not the only method of authenticating a text message.

> In cases where a sponsoring witness may testify to an association between a cell-phone number and a purported author, other evidence may be available that might bridge the logical gap and permit a proper inference that the purported author sent the message. The other evidence might include the message's "appearance, contents, substance, internal patterns, or other distinctive characteristics," which considered in conjunction with other circumstances support a conclusion that a message indeed emanated from the purported author.

*Butler v. State*, 459 S.W.3d 595, 602 (Tex. Crim. App. 2015) (quoting TEX. R. EVID. 901(b)(1)); *see also Mata v. State*, 517 S.W.3d 257, 266 (Tex. App.—Corpus Christi 2017, pet. ref'd). "And in still other cases, the content and/or context of a particular exchange of messages may create an inference supporting the conclusion that it was in fact the purported author who sent them." *Butler*, 459 S.W.3d at 602 (citing *Tienda*, 358 S.W.3d at 641 & n. 34). "As with evidence in general, authenticating evidence may be direct or circumstantial." *Id*.

Zach testified that he recognized the text messages that were sent to him came from Appellant because Zach recognized the phone number. Zach also testified that the contents of the text messages were similar to messages that Appellant had previously

sent to him. Zach noted that Appellant sent the same type of messages to him through Facebook Messenger.

The text messages sent to Caitlyn were viewed by her sister and photographed by the deputies who responded to Caitlyn's aggravated assault complaint. Caitlyn told them that the text messages were from Appellant. The text messages revealed knowledge that could only have been obtained by viewing Caitlyn's house, as Appellant did the times he drove by. The text messages also contained the same threats made by Appellant on other occasions to Caitlyn. Finally, Appellant admitted sending the texts to both Zach and Caitlyn when he testified at trial.

The trial court did not err in allowing the text messages sent to Zach and Caitlyn to be entered into evidence.

4. Unfair Prejudice. Appellant argues that the text messages, even if relevant, should have been excluded as their probative value was outweighed by their unfair prejudice to him. Even if evidence is admissible under Rule 404(b), the trial judge still has the discretion to exclude the evidence under Rule 403 if its probative value is substantially outweighed by a danger of unfair prejudice, confuses the issues, or misleads the jury. TEX. R. EVID. 403; *Henley v. State*, 493 S.W.3d 77, 93 (Tex. Crim. App. 2016). When undertaking a Rule 403 analysis, the court must balance

> (1) the inherent probative force of the proffered item of evidence along with (2) the proponent's need for that evidence against (3) any tendency of the evidence to suggest decision on an improper basis, (4) any tendency of the evidence to confuse or distract the jury from the main issues, (5) any tendency of the evidence to be given undue weight by a jury that has not been equipped to evaluate the probative force of the evidence, and (6) the likelihood that presentation of the evidence will consume an inordinate

amount of time or merely repeat evidence already admitted. Of course, these factors may well blend together in practice.

*Newton*, 301 S.W.3d at 319 (quoting *Gigliobianco v. State*, 210 S.W.3d 637, 641-42 (Tex. Crim. App. 2006) (footnotes omitted)). "'[P]robative value' refers to the inherent probative force of an item of evidence—that is, how strongly it serves to make more or less probable the existence of a fact of consequence to the litigation—coupled with the proponent's need for that item of evidence." *Casey v. State*, 215 S.W.3d 870, 879 (Tex. Crim. App. 2007). "Evidence is unfairly prejudicial when it tends to have some adverse effect upon the defendant beyond tending to prove the fact or issue that justifies its admission into evidence." *Gerron v. State*, 524 S.W.3d 308, 321 (Tex. App.—Waco 2016, pet. ref'd). Rule 403 should be used sparingly and envisions exclusion only where there is a "clear disparity between the degree of prejudice of the offered evidence and its probative value." *Hammer v. State*, 296 S.W.3d 555, 568 (Tex. Crim. App. 2009) (quoting *Conner v. State*, 67 S.W.3d 192, 202 (Tex. Crim. App. 2001)); *see also Hedrick v. State*, 473 S.W.3d 824, 833 (Tex. App.—Houston [14th Dist.] 2015, no pet.). Trial courts should favor admission in close cases. *Casey*, 215 S.W.3d at 879.

In the present case, Appellant first asserted in his opening statement that Caitlyn committed suicide. The State was, therefore, entitled to introduce evidence to rebut the issue of suicide and to clarify the relationship between Appellant and Caitlyn. In this regard, the text messages showed Appellant's attempts to control Caitlyn through threats, belittlement, and attempted isolation from her family and friends. The trial court

did not abuse its discretion in admitting the text messages. Appellant's second issue is overruled.

### *Imposition of Costs*

In his four and fifth issues, Appellant argues that the trial court erred by assessing court costs against him because he is indigent. Appellant further argues that the statutes authorizing the assessment of costs against indigent criminal defendants are unconstitutional as applied to him and also violate his right to equal protection because court costs are not assessed against civil litigants. This Court has overruled substantially similar arguments pertaining to the imposition of court costs for indigent defendants and the constitutionality of the court-cost statutes. *See, e.g., Martinez v. State*, 507 S.W.3d 914, 916-18 (Tex. App.—Waco 2016, no pet.); *see also Steggall*, 2018 WL 3763747, at *4. We overrule issues four and five.

### *Conclusion*

Having found no reversible error, we affirm the trial court's judgment.


REX D. DAVIS
Justice

Before Chief Justice Gray,*
Justice Davis, and
Justice Neill
*(Chief Justice Gray concurs in the Court's judgment but does not join the Court's memorandum opinion.  A separate opinion will not issue.)
Affirmed
Opinion delivered and filed April 24, 2019
Do not publish
[CRPM]

